CORNERSTONE REALTY, INC., Plaintiff,

v.

DRESSER RAND COMPANY and Ingersoll Rand Company, Defendants.

Civil No. 3:94CV1560 (DJS).

United States District Court, D. Connecticut.

Jan. 5, 1998.

J. Christopher Rooney, Carmody & Torrance, New Haven, CT, for Plaintiff.

Lawrence J. Golden, Sandler & Daniels, Hartford, CT, for Defendants.

## ORDER

SQUATRITO, District Judge.

After a careful, de novo review, and over the objections of the plaintiff and the defendant, the Magistrate Judge's recommended ruling (Document number 256) is hereby adopted, ratified and approved. The motion to dismiss is granted in part and denied in part. Document number 192. The motions for summary judgment are denied without prejudice. Document numbers 243 and 246. The parties shall file a joint trial memorandum relating to all issues to be decided by the court on March 23, 1998. The pretrial compliance shall include:(1) proposed findings of fact; (2) issues of law; (3) a list of witnesses; and (4) a list of documents.

## RECOMMENDED RULING ON CONSOLIDATED MOTION TO DISMISS SECOND AMENDED COMPLAINT

MARTINEZ, United States Magistrate Judge.

This action arises out of a failed real estate transaction of commercial property in Windsor, Connecticut. Having discovered contamination on the property, the intended purchaser of the property brought this action for injunctive relief and damages against the

current and former property owners. The second amended complaint asserts claims under federal and state environmental laws, the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110a *et seq.*, and state common law.

Pending before the court is the defendants' motion to dismiss counts 6, 7, 9, 10, 13 and 15 of the plaintiff's second amended complaint.[1] For the reasons that follow, the court recommends that the Consolidated Motion to Dismiss Second Amended Complaint (doc. #192) be GRANTED as to counts 7 and 9 and DENIED as to counts 6, 10, 13 and 15.

### STANDARD OF REVIEW

When considering a Rule 12(b) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." *United States v. Yale New Haven Hosp.,* 727 F.Supp. 784, 786 (D.Conn.1990) (citing *Scheuer,* 416 U.S. at 232).

1. The defendants have withdrawn their motion with respect to count 14.

2. Connecticut courts have not been uniform as to whether a cause of action for the breach of good faith is properly characterized as an action in tort or an action on a contract. Compare *Buckman v. People Express, Inc.,* 205 Conn. 166, 170–71, 530 A.2d 596 (1987) (court recognizes an independent cause of action in tort for insurer's breach of the common law duty of good faith arising out of contractual relationship) and *National Semiconductor v. Allendale Mut. Ins. Co.,* 549 F.Supp. 1195, 1200 (D.Conn.1982) ("Connecticut courts have ruled that a breach of the

### DISCUSSION

### I. COUNT SIX: BREACH OF DUTY OF GOOD FAITH

The defendants argue that there is no separate cause of action for the breach of the duty of good faith and fair dealing and that the plaintiff's claim should be dismissed because it is subsumed within the plaintiff's claim for breach of contract. The defendants also argue, apparently in the alternative, that the plaintiff must allege that Dresser–Rand unfairly performed under the contract in order to assert a claim for breach of the duty of good faith. The plaintiff responds that the sixth claim for relief alleges facts which show that Dresser–Rand acted dishonestly in performing its contractual duties without necessarily having violated an express written provision of the contract.

The Connecticut Supreme Court has recognized the implied covenant of good faith and fair dealing in a variety of contractual relationships, including leases, insurance contracts and construction contracts. *Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 566, 479 A.2d 781 (1984). Designed to fulfill the reasonable expectations of the contracting parties as they presumably intended, the covenant requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Home Ins. Co. v. Aetna Life & Casualty Co.,* 235 Conn. 185, 200, 663 A.2d 1001 (1995) (quoting *Habetz v. Condon,* 224 Conn. 231, 238, 618 A.2d 501 (1992)). Breach of the implied covenant of good faith and fair dealing gives rise to an independent cause of action.[2]

implied covenant of good faith and fair dealing provides an injured party with a tort action, notwithstanding that the acts complained of may also constitute a breach of contract") with *People's Bank v. Arm Enterprises, Inc.,* No. 285171, 17 Conn.L.Rptr. No. 13, 457, 458, 1996 WL 499176 (October 14, 1996) ("an action for breach of an implied covenant of good faith and fair dealing is an action on a contract and not an action in tort"). Whether an action for breach of the implied covenant of good faith and fair dealing sounds in tort or is an action on a contract need not be addressed in deciding the defendants' motion to dismiss in this action.

■ The plaintiff here has alleged a cause of action for breach of the implied covenant of good faith and fair dealing sufficient to overcome the defendants' motion to dismiss. The plaintiff has alleged that Dresser–Rand purposefully withheld documents when it was contractually obligated to disclose all reports in its possession or control. Second Amended Complaint, Count 6, ¶ 40. The plaintiff also alleges that Dresser–Rand obstructed Cornerstone's attempt to exercise its contractual right to investigate the condition of the property. *Id.* at ¶ 41. The plaintiff further alleges that, upon discovery of the condition of the property, Dresser–Rand either refused to speak or meet with Cornerstone or negotiated in bad faith for the purpose of delaying enforcement of the contract. *Id.* at ¶ 40. These allegations state facts which show that the defendants acted in a manner to injure the plaintiff's right to receive the benefit of its bargain. Count Six should not be dismissed.

## II. COUNT SEVEN: CUTPA

In the seventh claim for relief, the plaintiff alleges that Dresser–Rand violated CUTPA by engaging in a pattern of conduct in which it knowingly misrepresented the condition of the property and bargained in bad faith in an "attempt to transfer environmentally contaminated properties to unsuspecting purchasers." Second Amended Complaint, Count 7, ¶ 48. The defendant Dresser–Rand moves to dismiss the plaintiff's CUTPA claim on the following three grounds: (1) that the plaintiff failed to allege that Dresser–Rand's primary trade or commerce is the sale of real estate; (2) that the complaint establishes that Dresser–Rand's conduct was not unfair; and (3) that the plaintiff suffered no ascertainable loss. The CUTPA claim should be dismissed because the allegations cannot support a finding that Dresser–Rand's attempt to sell the Windsor property occurred in the conduct of its primary trade or commerce. The other grounds for dismissal raised by Dresser–Rand need not be reached.

■ CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in

the conduct of any trade or commerce." Conn.Gen.Stat. § 42–110b(a). "Trade" or "commerce" is defined in CUTPA as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property . . . and other article, commodity, or thing of value in this State." Conn.Gen.Stat. § 42–110a(4). Thus, by its very terms, CUTPA may apply to the sale or offering for sale of real estate. The question before the court, however, is whether efforts to sell the Windsor property were in the conduct of Dresser–Rand's "trade" or "commerce" within the meaning of CUTPA.

Relying on *Arawana Mills Co. v. United Technologies Corp.*, 795 F.Supp. 1238 (D.Conn.1992) (Cabranes, J.), Dresser–Rand contends that it cannot be held liable under CUTPA for its actions in attempting to sell the Windsor property because it is not in the trade or commerce of selling real estate. In *Arawana Mills*, the plaintiff alleged that United Technologies Corporation ("UTC") had contaminated real property which UTC had leased from the plaintiff. *Id.* at 1240–41. The plaintiff claimed that UTC's "activities as lessee on the [p]roperty and in leasing said premises" were in violation of CUTPA. *Id.* at 1252. UTC moved to dismiss the CUTPA claim on the ground that UTC could not be held liable for a CUTPA violation arising out of its leasing of property because UTC was not in the trade of leasing property. *Id.* UTC's trade or commerce, as alleged by the plaintiff, was the repair and servicing of aircraft engines. *Id.* at 1253. Recognizing that UTC's "act of leasing property from plaintiff is incidental to the conduct of its true business . . . , the repair and servicing of aircraft engines," Judge Cabranes held that the plaintiff was unable to assert a CUTPA claim arising out of UTC's conduct in leasing the property and therefore dismissed the CUTPA claim. *Id.*

Cornerstone contends that this case is distinguishable from *Arawana Mills* in that this case involves no allegation that Dresser–Rand's trade or commerce is anything other than the sale of real estate.[3] Because the

---

3. Cornerstone also argues that *Arawana Mills* is      distinguishable from the present action because

only business of Dresser–Rand that is alleged in the complaint is the sale of real estate, Cornerstone argues, the court may consider the sale of real estate to be Dresser–Rand's primary trade or commerce in Connecticut. The court disagrees. Contrary to Cornerstone's contention, the Second Amended Complaint alleges that Dresser–Rand and its general partners are each "substantial manufacturing and industrial companies." Second Amended Complaint, ¶ 12. The sale of a manufacturing facility that is no longer in operation would therefore be incidental to Dresser–Rand's business of manufacturing.

Cornerstone also argues that when determining Dresser–Rand's trade or commerce for the purposes of CUTPA, the court may consider only those activities which Dresser–Rand engaged in within the state of Connecticut. In support of this argument, Cornerstone points out that CUTPA defines the term "trade" or "commerce" as certain activities conducted "in this State." Conn.Gen. Stat. § 42–110a(4). The court is not persuaded. Although jurisdictional considerations limit Connecticut's regulation of trade practices to activity in Connecticut, that does not mean that the nature of the defendant's trade or commerce is to be evaluated by reference to the defendant's activities in Connecticut only.

Finally, the plaintiff argues that CUTPA, as a remedial statute, should be liberally construed and that to limit the scope of CUTPA's application to conduct in one's primary or true trade or commerce—as the *Arawana Mills* court did—would be contrary to the intent of the legislature. The Connecticut Supreme Court has not addressed whether a CUTPA violation may arise out of conduct that is merely incidental to the conduct of one's primary or true trade or commerce. This court must therefore predict how Connecticut's highest court would rule in the circumstances of this case. *See Doyle v. St. Paul Fire & Marine Ins. Co., Inc.,* 583 F.Supp. 554, 555 (D.Conn.1984) (when deciding issue not yet decided by the highest court of the state, federal court sitting in diversity may consider all data the highest court would use to determine how that court would decide).

■ Since *Arawana Mills,* the district court in Connecticut has decided the issue presented here in a case similar to this one. In *Sealy Connecticut, Inc. v. Litton Industries, Inc.,* 989 F.Supp. 120 (D.Conn.1997), the plaintiff claimed that the defendant violated CUTPA by allegedly contaminating certain property it had leased from the plaintiff and then concealing from the plaintiff the extent of the environmental contamination. The court noted that the claim encompassed the allegations of concealment, but reasoned that "the key question is whether leasing property is defendant's trade or commerce." *Id.* (quoting *Arawana Mills,* 795 F.Supp. at 1252–53). Following the holding of *Arawana Mills,* the court dismissed the CUTPA claim. *Id. See also Brandewiede v. Emery Worldwide,* 890 F.Supp. 79, 81 (D.Conn.1994) (no viable claim under CUTPA for conduct in leasing aircraft where leasing aircraft was incidental to defendant's primary business of providing overnight freight service) (Eginton, J.).

A number of state trial courts have also followed *Arawana Mills* in deciding whether conduct that was incidental to a defendant's business could form the basis of a CUTPA violation. *E.g., Abely Waste Oil Servs., Inc. v. Ravenswood Dev. Corp.,* No. CV95–0369487S, 1 Conn.Ops. 1105, 1995 WL 562203 (J.D. New Haven, September 15, 1995) (disposal of waste oil by development company was merely incidental to primary trade of developing real estate and therefore could not form basis for CUTPA claim) (Hartmere, J.); *Barnes v. General Electric Co.,* No. CV 930529354, 14 Conn.L.Rptr. 455, 1995 WL 447904 (J.D. Hartford/New Britain at Hartford, July 25, 1995) (manufacturer's disposal of hazardous waste could not form basis of CUTPA claim because waste disposal is only

the activity alleged to violate CUTPA in *Arawana Mills* was the pollution of the property whereas the alleged CUTPA violation in this action is the conduct of Dresser–Rand in attempting to sell property. This distinction, however, is not mate-

rial to the court's analysis. Even with this distinction, the central question that remains for the court to decide is whether the acts alleged to constitute a violation of CUTPA occurred in the conduct of the defendant's trade or commerce.

incidental to manufacturing business) (Hennessey, J.); *Heyman Associates # 1 v. United Technologies Corp.*, No. CV91–289456S, 8 Conn.L.Rptr. 360, 1993 WL 55243 (J.D. Bridgeport, February 17, 1993) (alleged concealment of environmental contamination of property by lessee did not support CUTPA claim as defendant was not in the trade or business of being a lessee) (Stodolink, J.). *But see Cizynski v. Tartantino*, No. CV 950147496S, 1996 WL 456981 (July 19, 1996)(observing that state courts have not uniformly decided the issue of whether CUTPA applies to the one-time sale of a business by one not engaged in the business of selling businesses).

■ This court agrees with the principle that a CUTPA violation may not arise out of conduct that is merely incidental to the performance of one's trade or commerce. Applying this principle to this case, the court determines that the plaintiff has failed to state a claim under CUTPA. Accordingly, the seventh count should be dismissed.

### III. *COUNT NINE: NUISANCE*

In its ninth claim for relief, Cornerstone seeks an abatement order based on a claim of nuisance pursuant to Conn.Gen.Stat. § 52–481. The defendants move to dismiss this claim on the ground that Cornerstone, as a prospective property owner, is without standing to raise a claim of private nuisance because such a claim may only be brought by neighboring property owners. Cornerstone responds that Connecticut law does not require the plaintiff to be a neighboring landowner in order to assert a claim of private nuisance. Cornerstone further argues that its claim is one of public or statutory nuisance and any such requirement would therefore not apply. The defendants reply that the plaintiff has not alleged a claim of public nuisance.

■ To assert a claim of public nuisance, the plaintiff must allege that the condition complained of interfered with a right that is common to the general public. *Vernon Village, Inc. v. Gottier*, 755 F.Supp. 1142, 1155–56 (D.Conn.1990). Cornerstone has not alleged any interference in the exer-

cise of a public right. The count therefore fails to assert a claim of public nuisance.

■ As to the parties' arguments concerning a claim of private nuisance, the court follows the reasoning of *Nielsen v. Sioux Tools, Inc.*, 870 F.Supp. 435 (D.Conn.1994) (Covello, J.). *Nielsen* involved a claim of private nuisance brought by the purchaser of environmentally contaminated property against the predecessor in possession who had allegedly caused the contamination. The *Nielsen* court recognized that the doctrine of caveat emptor ordinarily precludes owners of property from having the requisite standing to bring nuisance suits against a predecessor in possession. *Id.* at 442–43. The court noted, however, that the doctrine of caveat emptor would not apply to defects in the property which are not discoverable on reasonable inspection and of which the predecessor in possession is chargeable with knowledge. *Id.* at 443 n. 12 (citing *Masterson v. Atherton*, 149 Conn. 302, 307, 179 A.2d 592, 595 (1962)). The court therefore considered whether the plaintiff's allegations supported the position that the doctrine of caveat emptor would not apply. *Id.* at 443. Because the plaintiff did not allege facts which would show that the harm was not discoverable by the plaintiff's reasonable inspection, the court held that the doctrine of caveat emptor did apply and precluded the plaintiff from bringing a claim of private nuisance. *Id. See also Sealy Connecticut, Inc. v. Litton Industries, Inc.*, 989 F.Supp. 120 (D.Conn.1997) (doctrine of caveat emptor precluded private nuisance action by property owner against predecessors in possession).

Like the plaintiffs in *Nielsen* and *Sealy Connecticut*, Cornerstone has pleaded no allegations nor offered any authority on which this court may find that the claims against the defendants are not precluded by the doctrine of caveat emptor. Indeed, Cornerstone's complaint makes it apparent that it did discover that the property was contaminated during its due diligence investigation. Second Amended Complaint, ¶¶ 25, 26, and 29. Cornerstone is therefore without standing to assert a cause of action for private nuisance against the defendants. Accordingly, this count should be dismissed.

## IV. COUNTS TEN AND THIRTEEN: RCRA ENFORCEMENT ACTIONS

The plaintiff's tenth and thirteenth claims for relief are brought pursuant to the citizen suit provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(A). In the tenth claim for relief, the plaintiff claims that the defendants, having generated hazardous waste at the Windsor property, failed to decontaminate properly and undergo closure of the area in accordance with environmental regulations applicable to hazardous waste generators. In the thirteenth claim for relief, the plaintiff alleges that the defendants also failed to comply with closure regulations applicable to hazardous waste management facilities. In both counts, the plaintiff alleges that the defendants' failure to undergo closure of the facility constitutes a continuing violation of subchapter III of RCRA and RCSA § 22a–449(c)–102.

The defendants move to dismiss counts 10 and 13 on the ground that the claims are time barred. Before turning to the issues raised by the defendants' motion, the court first examines the regulatory context in which the RCRA claims arise.

▄▄▄ The overriding concern of RCRA is to minimize the adverse environmental impact of solid waste, especially hazardous waste. *United States v. Production Plated Plastics, Inc.*, 762 F.Supp. 722, 725 (W.D.Mich.1991), *aff'd*, 955 F.2d 45 (6th Cir.), *cert. denied*, 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992). To meet that objective, "RCRA establishes a 'cradle-to-grave' regulatory structure for the treatment, storage and disposal of solid and hazardous wastes." *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1313 (2d Cir.1993). As part of its extensive regulatory structure, RCRA requires that facilities which have treated, stored or disposed of hazardous wastes undergo a regulated process of "closure" upon termination of operation.[4] Closure of a hazardous waste facility must be performed in a manner that:

(a) Minimizes the need for further maintenance, and

(b) Controls, minimizes or eliminates, to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground or surface waters or to the atmosphere, and

(c) Complies with the closure requirements of [other regulations promulgated under RCRA].

40 C.F.R. § 265.111 (1996).

▄▄▄ As part of the closure process, facility owners and/or operators are required to prepare and submit for approval to the appropriate environmental authority a proposed closure plan. *See United States v. Conservation Chemical Co. of Ill.*, 733 F.Supp. 1215 (N.D.Ind.1989) (the failure to file a substantially acceptable closure plan in a timely fashion constitutes a violation of RCRA). The plan must include financial assurances for proper closure and, in some cases, for post-closure care. *See United States v. Ekco Housewares, Inc.*, 853 F.Supp. 975, 988 (N.D.Ohio 1994) (40 C.F.R. 265.145 requires an owner/operator of a hazardous waste facility to establish and maintain financial assurances for closure and, where required, for post-closure care), *rev'd, in part, on other grounds*, 62 F.3d 806, 812 (6th Cir.1995). Once approved, the closure plan must be implemented. *United States v. Production Plated Plastics, Inc.*, 762 F.Supp. 722, 729 (W.D.Mich.1991) (defendants' failure to implement closure plan was directly at odds with the stated purpose of RCRA), *aff'd*, 955 F.2d 45 (6th Cir.), *cert. denied*, 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992). In addition, facility owners and operators must certify that closure has been completed pursuant to the approved plan. *American Iron & Steel Institute v. United States E.P.A.*, 886 F.2d 390, 400 (D.C.Cir.1989) ("closure is not complete under the hazardous waste regulations until a certification of

---

4. The closure requirements under RCRA also apply to certain generators of hazardous wastes.

40 C.F.R. § 262.34(b) (1996).

closure has been given under 40 C.F.R. § 265.115" (quoting 50 Fed.Reg. at 28, 712)). Even after closure has been completed, the owner or operator may be required to maintain post-closure care of the facility for a period of thirty years. 40 C.F.R. § 265.117 (1996). Thus, RCRA clearly provides for extensive regulation of a hazardous waste facility long after the facility has stopped operating. *See American Iron & Steel Institute v. United States E.P.A.*, 886 F.2d 390, 393 (D.C.Cir.1989) ("While invariably described as a 'cradle-to-grave' system, [RCRA] in fact reaches ... well beyond the grave."), *cert. denied*, 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990).

In the present action, the defendants contend that the plaintiff's RCRA claims are barred by the five year statute of limitations set forth at 28 U.S.C. § 2462.[5] The plaintiff argues that even if § 2462 applies to RCRA actions, counts 10 and 13 assert claims of continuing violations which toll the limitations period. Because the alleged failure to undergo closure first occurred when the facility was shut down more than five years before the claims were filed, the defendants argue that application of the continuing violation doctrine in this case would ignore the "first accrued" language of 28 U.S.C. § 2462.

Assuming, without deciding, that 28 U.S.C. § 2462 applies to RCRA actions,[6] the court now addresses the continuing violations argument. The continuing violations doctrine is simply a recognized exception to the general rule of accrual. *See, e.g., In re Harmon Electronics, Inc.*, U.S. E.P.A. RCRA (3008) Appeal No. 94–4, Docket No. VII–91–H–0037, 1997 RCRA Lexis 2 at *49 (March 24, 1997) (citing *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 (9th Cir.1984)). Under the continuing violation doctrine, "the limitations period for a continuing offense does not begin until the offense is complete." *United States v. Rivera–Ventura*, 72 F.3d 277, 281 (2d Cir.1995). Because a continuing violation tolls the running of the limitations period until the offense is complete, the date when a violation "first accrues" is not to be confused with the date when a violation "first occurs." *Id.* at *48–49.[7] Assuming that § 2462 applies, the court is not persuaded that the "first accrues" language of that statute prohibits allegations which constitute a continuing violation under RCRA.

The court now turns to the question of whether the allegations at issue in this action—that the defendants failed to decontaminate properly and to undergo closure of the site—assert a continuing violation under RCRA.

---

**5.** 28 U.S.C. § 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."

**6.** RCRA does not expressly provide a statute of limitations for actions brought pursuant to its citizen suit provision. In situations where a federal statute provides no statute of limitations, courts may "borrow" the limitations period from an analogous state or federal cause of action. *DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). In RCRA actions, courts have borrowed the five year limitations period set forth at 28 U.S.C. § 2462. *See, e.g., Glazer v. American Ecology Envtl. Servs.*, 894 F.Supp. 1029, 1044 (E.D.Tex. 1995); *Bodne v. Geo. A. Rheman Co., Inc.*, 811 F.Supp. 218, 221 (D.S.C.1993).

In this case, the plaintiff relies on the United States Supreme Court's recent decision in *Meghrig v. K.F.C. Western, Inc.*, 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) to argue that no statute of limitations applies to RCRA actions. The issue in *Meghrig* was whether RCRA's citizen suit provision authorizes the recovery of environmental clean up costs at sites that no longer pose a contamination threat. The Court unanimously held that it did not. *Id.* at 1253. As part of its analysis, the Court noted that RCRA contains no statute of limitations. *Id.* at 1255. The Court did not hold that no statute of limitations is to be applied to RCRA actions. However, the applicability of any statute of limitations to RCRA actions has been questioned since *Meghrig*. *See Nixon–Egli Equipment Co. v. John A. Alexander Co.*, 949 F.Supp. 1435, 1441 (C.D.Cal.1996) ("given the Supreme Court's decision [in *Meghrig*] that RCRA only comes into play if there is a present danger, it is likely that Congress did not intend for courts to apply any statute of limitations to such actions").

**7.** Indeed, if the defendants' argument were correct, then an active hazardous waste facility that had been operating without a permit for longer than the limitations period could continue to operate unlawfully and be immune from sanctions.

In both counts 10 and 13, the plaintiff alleges that "[a]t various times during Dresser–Rand's and/or its partners' ownership and occupancy of the Windsor Property and building, the Hazardous Substances were either deposited, pumped, poured, spilled, emptied, injected, escaped, dumped, stored, disposed of, placed, released or leached into the environment, and onto, in, and under the Windsor Property's soil and building and into the ground water thereunder...." Second Amended Complaint, ¶ 9. Also in both counts 10 and 13, the plaintiff alleges that, as late as 1994, hazardous substances remained in the soil and groundwater at the property, including chromic acid solutions, cadmium, sodium hydroxide, copper, nickel, barium, zinc, lead, 1,1–Dichloroethylene, cis–1,2–Dichloroethylene, Trichloroethylene and petroleum hydrocarbons. *Id.* at ¶ 29.

Emphasizing the dates when hazardous wastes allegedly were generated and stored at the property,[8] and when manufacturing operations at the facility terminated,[9] the defendants argue that their failure to undergo closure does not constitute a series of ongoing violations. Rather, the defendants contend that any alleged violation occurred at the time when the defendants shut down the facility. The essence of the defendants' argument is that they were under no continuing obligation to undergo closure after the facility had been shut down. The court disagrees. The regulations concerning closure and the relevant caselaw suggest that the obligation to undergo closure continues in cases where, as is alleged here, hazardous waste remains on the property. For example, in *Murray v. Bath Iron Works Corp.*, 867 F.Supp. 33, 42–43 (D.Me.1994), nearby residents brought a RCRA citizen suit against the operator of a landfill, alleging that the defendant failed to comply with the

closure and post-closure requirements of RCRA, 42 U.S.C. § 6972(a)(1)(A). *Id.* at 42. The undisputed facts established that the DEP-approved closure plan called for the complete capping of the site by 1985. *Id.* at 43. The court noted, however, that the eastern portion of the landfill remained uncapped as of 1994. *Id.* Because of the defendant's continuing failure to comply with the closure plan requirement that the site be capped nine years earlier, the court denied the defendant's motion for summary judgment, stating that it was "unable to conclude that, as a matter of law, [the defendant] is not *presently* in violation of the closure requirements ..." *Id.* (emphasis added).

In *United States v. Production Plated Plastics, Inc.*, 762 F.Supp. 722 (W.D.Mich. 1991), *aff'd* 955 F.2d 45 (6th Cir.), *cert. denied* (1992), the court found that the defendant operators of a hazardous waste facility failed to implement an approved closure plan and that hazardous waste remained stored at the site. Granting an injunction ordering compliance with RCRA's closure requirements, the court stated, "[i]n failing to implement a closure plan mandated by RCRA, defendants are acting directly at odds with the stated purpose of RCRA. Every day that the [defendants'] facility remains unclosed the threat from the hazardous waste stored there goes unabated." *Id.* at 729.

*Goodwill Industries of Chicago v. Valspar Corp.*, No. 89 C 5116, 1990 WL 485455 (N.D.Ill. Mar.9, 1990), is another case in which the failure to close was found to constitute a continuing violation of RCRA regulations. In *Goodwill Industries,* the defendant Valspar Corporation had operated a hazardous waste facility on land owned by another defendant, Conant. Conant eventually do-

---

**8.** In count 10, the plaintiff alleges that Dresser–Rand generated hazardous wastes at the property "through as late as 1988," and that hazardous wastes were stored on the property "through at least 1987." Second Amended Complaint, Count 10, ¶¶ 44, 48. In count 13, the plaintiff alleges that hazardous wastes were generated during the shut down of operations at the property in 1987. *Id.*, Count 13, ¶¶ 40–43. The plaintiff also alleges that more than 1,000 kilograms of hazardous wastes were generated and accumulated at the property in 1987, *Id.* at ¶ 44, and that more than

1,000 kilograms of hazardous wastes were stored for more than 90 days in an underground tank on the property from 1964 to 1984. *Id.* at ¶ 45.

**9.** The plaintiff alleges that the defendants terminated manufacturing operations at the property in 1987. Second Amended Complaint, Count 13, ¶ 40. The plaintiff also alleges that "Dresser–Rand terminated its use of [a hazardous waste] accumulation area during 1988 or 1989." *Id.*, Count 10, ¶ 50.

nated the land to the plaintiff, Goodwill Industries, a not-for-profit corporation. *Id.* at *1. At the time that the property was donated to Goodwill Industries, Valspar agreed to apply for and perform closure of the waste storage facility. *Id.* Valspar thereafter certified that closure had been completed. *Id.* at *2. Upon inspection of the property, however, the state environmental authority found violations of environmental regulations and concluded that Valspar had failed to properly close the facility. *Id.* Approximately three years later, Goodwill Industries filed suit against Valspar and Conant under RCRA, 42 U.S.C. § 6972(a)(1)(A), alleging violations of numerous RCRA regulations, requirements and permits, including the failure to properly close the facility. *Id.* at *2–3. Valspar and Conant moved to dismiss the plaintiff's claims on the ground that § 6792(a)(1)(A) provides only prospective relief for continuing violations and that, as a former operator and a former owner, any violations of RCRA that they might have committed were wholly past. *Id.* at *3. The court disagreed:

> Taking the allegations of Goodwill's complaint as true, Valspar and Conant, as the operator and owner, continue to be the "permittees" of the waste storage facility located at the Site and have failed to close the Site consistent with the RCRA regulations promulgated thereunder. This alleged conduct, if proven true, constitutes a continuing violation of their "permit" and RCRA regulations.

*Id.* at *5.

These cases demonstrate that the obligation of an owner or operator of a hazardous waste facility to close the facility continues while the facility remains unclosed with hazardous waste remaining at the site. This court concludes that when such circumstances exist, the failure to close the facility may constitute a continuing violation sufficient to toll the statute of limitations. In this action, where it is alleged that hazardous waste remains on the property, the court is unable to conclude that, as a matter of law, the plaintiff will be unable to prove a continuing violation of RCRA. Accordingly, the motion to dismiss counts 10 and 13 should be denied.

## V. COUNT FIFTEEN: THE GENERAL PARTNER

The fifteenth claim for relief alleges that Ingersoll–Rand, as a general partner of the Dresser–Rand partnership, directed the actions of Dresser–Rand. The plaintiff therefore claims that Ingersoll–Rand can be held liable for the acts and omissions of Dresser–Rand.[10] Ingersoll–Rand moves to dismiss the fifteenth count on the ground that the complaint fails to allege that Dresser–Rand is unable to pay its obligations, an allegation that is required in order for a general partner to be held liable for the debts of a partnership under New York law. Cornerstone contends that it is Connecticut law, not the law of New York, that governs any disputes associated with the contract between Dresser–Rand and Cornerstone. Under Connecticut law, general partners are individually liable for acts of the partnership which the general partner directs or controls. *Keeney v. L & S Construction,* 226 Conn. 205, 208, 626 A.2d 1299 (1993).

The question before the court, therefore, is whether Connecticut or New York law determines the sufficiency of the claim asserted in the fifteenth count. To answer this question, this court applies Connecticut's choice of law rules. *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) (federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state). Connecticut uses different choice of law rules for different types of actions. *Bensmiller v. E.I. Dupont De Nemours & Co.,* 47 F.3d 79, 83 (2d Cir.1995). In contract cases, Connecticut has traditionally looked to the substantive law of the state where the contract was formed or where the contract will have operative effect. *Id.* (cit-

---

**10.** The fifteenth claim for relief had originally been brought against both of the general partners of the Dresser–Rand Company, Ingersoll–Rand and Dresser Industries. After the defen-

dants filed their motion to dismiss, the plaintiff withdrew the action against Dresser Industries (doc. # 198).

**118**

ing *Williams v. State Farm Mut. Auto. Ins. Co.,* 229 Conn. 359, 365, 641 A.2d 783 (1994)); *see also U.S.F. & G. Co. v. Katrick,* No. Cv92 03 80 14S, 1992 WL 83554, at *3 (Conn.Super. Apr.21, 1992) (calling this rule the "place of contract" rule).

Both Cornerstone and Ingersoll–Rand have employed the "place of contract" rule to arrive at different conclusions. Cornerstone contends that Connecticut law governs the fifteenth claim for relief because the contract for the sale and purchase of the Windsor property was formed in Connecticut. Ingersoll–Rand contends that this court should apply the law of New York, the state where the agreement creating the Dresser–Rand partnership was formed.

■ The contract which determines the rights and obligations of the partners with respect to the partnership is the partnership agreement. *Liona Corp., Inc. v. PCH Associates,* 949 F.2d 585, 599 (2d Cir. 1991) (rights and obligations of parties to a joint venture depend primarily on the terms of the agreement that created the relationship). The determination of what law governs the partnership agreement is dependent on a number of factors, including whether the partnership agreement contains a choice of law clause. *Elgar v. Elgar,* 238 Conn. 839, 850, 679 A.2d 937 (1996) (with certain exceptions, parties to a contract generally are allowed to select the law that will govern their contract). Thus, if the partnership agreement contains a choice of law provision, then the law that governs the agreement may be the law chosen by the parties to the agreement.

In the present case, the court is unable to determine as a matter of law, based on the allegations of the complaint, which state's law governs the partnership agreement. Ingersoll–Rand has therefore failed to meet its burden of proving that no relief may be granted under any set of facts that the plaintiff can prove consistent with the allegations of this count.

Accordingly, the motion to dismiss should be denied with respect to count 15.

*CONCLUSION*

Based on the foregoing, the court recommends that the Consolidated Motion to Dismiss Second Amended Complaint (doc. # 192) be GRANTED as to counts 7 and 9, and DENIED as to counts 6, 10, 13 and 15.

A party may seek district court review of a recommended ruling by a magistrate judge. *See* 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within ten days after service of same); Fed.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992) (failure to file timely objection to Magistrate Judge's recommended ruling waives further review of the ruling).