# FREDERICK HAYES ET AL. *v.* MARK H. CAMEL ET AL.
## (SC 17430)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued January 9—officially released August 7, 2007

*Joshua D. Koskoff*, with whom was *Cynthia C. Bott*, for the appellants (plaintiffs).

*Catherine S. Nietzel*, for the appellees (defendants).

Opinion

NORCOTT, J. The sole issue in this appeal is whether, in a medical malpractice action without a claim of lack of informed consent, the trial court properly admitted testimonial and documentary evidence that the defendant surgeon had informed his patient of the risks of the medical procedure in question. The plaintiffs, Frederick Hayes and Barbara Hayes,[1] brought this action for medical malpractice and loss of consortium against the defendants, Mark H. Camel and Paul Apostolides, arising from their alleged negligence in the surgical treatment of the plaintiff. The plaintiff appeals[2] from the judgment of the trial court, rendered after a jury trial, in favor of the defendants. We conclude that the trial court improperly admitted evidence pertaining to informed consent,[3] but that that impropriety was harm-

---

[1] The trial court, *Karazin, J.*, also granted the motion of the named plaintiff's employers, the city of Stamford and the Turn of River fire department, to intervene in this action pursuant to General Statutes § 31-293. Hereafter, for the sake of clarity, all references in this opinion to the plaintiff are to Frederick Hayes.

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] "[U]nlike the traditional action of negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the adequacy of the explanation given by the physician in obtaining the patient's consent." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 180, 896 A.2d 777 (2006); see also *Pekera* v. *Purpora*, 80 Conn. App. 685, 691, 836 A.2d 1253 (2003) ("The distinction between a duty to exercise due care in the performance of requisite medical procedures and a duty to exercise due care in informing a patient of medical risks is not merely linguistic. It reflects, instead, the fundamental difference between the appropriate performance of professional skills and the proper engagement of a patient in decision making about his or her professional care."), aff'd, 273 Conn. 348, 869 A.2d 1210 (2005). "Traditionally, a physician's duty to disclose information was measured by a professional standard which was set by the medical profes-

less. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. In August, 1998, the plaintiff, a Stamford firefighter assigned to the Turn of River fire department, injured his back when he moved several cases of soda while at work. He was diagnosed with a herniated disc in his lumbar spine at the L4 nerve root that affected the motor and sensory function in his right leg and knee; physical therapy did not alleviate those symptoms. On November 30, 1998, Camel, a neurosurgeon who had been monitoring the plaintiff's progress in physical therapy, presented as a treatment option a microdiscectomy, which is a surgical procedure to remove the herniated disc or parts thereof.

Thereafter, Camel, assisted by Apostolides, performed a microdiscectomy on the plaintiff. During that procedure, Camel used a high-speed drill to shave down the lamina, which is a bone layer surrounding the spinal column, in order to gain access to the pieces of the herniated disc that were pressing on the plaintiff's lumbar spinal nerves and causing his pain and neurological symptoms. Once he had thinned the lamina sufficiently, Camel used a hand instrument known as a Kerrison

sion in terms of customary medical practice in the community. . . . [However, in] *Logan* v. *Greenwich Hospital Assn.*, [191 Conn. 282, 292–93, 465 A.2d 294 (1983)], we adopted a lay standard and stated that under the doctrine of informed consent, a physician is obligated to provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Internal quotation marks omitted.) *Duffy* v. *Flagg*, 279 Conn. 682, 691, 905 A.2d 15 (2006). "We repeatedly have set forth the four elements that must be addressed in the physician's disclosure to the patient in order to obtain valid informed consent. [I]nformed consent involves four specific factors: (1) the nature of the procedure; (2) the risks and hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure." (Internal quotation marks omitted.) Id., 692.

rongeur to finish cutting through the lamina. Apostolides assisted him by holding a retractor, which previously had been placed by Camel, to move the L4 nerve away from the surgical field.

While Camel drilled the surface of the lamina, at some point, a "V" shaped rent, or opening, was made in the dura, the thin tissue beneath the lamina that covers the arachnoid, which contains the cerebral spinal fluid that surrounds the spinal nerve roots.[4] This resulted in a small leakage of cerebral spinal fluid, before Camel was able to repair the rent during the procedure.

It became apparent in the weeks following the surgery that, although the plaintiff's back pain had improved, he also had sustained some damage to his sacral nerves. This sacral nerve damage was the result of arachnoiditis, which is an inflammation of the arachnoid that had followed the surgery and caused the sacral nerve roots therein to clump together, affecting their function.[5] This nerve damage also has caused the plain-

---

[4] The lamina is further separated from the dura by a ligament known as the ligamentum flavum. Apostolides testified that the sight of this ligament is considered an anatomical "stop sign" during surgical procedures, but he also stated that the ligament might not be visible because it could stick to the dura.

[5] The parties proffered numerous medical opinions about the cause of the plaintiff's postsurgical arachnoiditis. The plaintiff's principal expert witness, Avi Bernstein, an orthopedic surgeon, testified that Camel, and not Apostolides, was responsible because improper retraction of the L4 nerve would not have caused the plaintiff's injuries since it would not have affected the sacral nerves. Rather, he concluded that Camel had caused the arachnoiditis by not having proper physical control of the drill or awareness of the anatomy, and failing to switch from the drill to hand instruments soon enough. In Bernstein's view, this breach of the standard of care caused the drill bit to enter the spinal canal, without actually touching any nerve rootlets, which created turbulence in the cerebral spinal fluid that injured the nerves therein. Bernstein also testified on cross-examination, however, that: (1) there was no published medical literature supporting this turbulence theory; (2) dural tears can occur during microdiscectomies even in the absence of negligence; and (3) the use of the high-speed drill to thin down the lamina was not by itself a violation of the standard of care.

Both defendants, as well as their expert witness, Michael Karnasiewicz,

tiff to suffer numbness in his buttocks and genitals, which resulted in bowel, bladder and sexual difficulties.[6] The plaintiff suffers from allodynia in his right foot, which causes him to experience excruciating pain upon even a light touch. The plaintiff now is constantly depressed and in pain, and he no longer is able to work as a firefighter or at his various side jobs, take part in recreational sporting activities that he previously had enjoyed, and can travel only with great difficulty.

Thereafter, the plaintiff brought this action claiming medical malpractice and loss of consortium. He claimed that Camel had failed to control the drill properly or take steps to protect the dura and the nerves therein,

a neurosurgeon, disagreed with Bernstein's turbulence theory, stating that it did not make sense anatomically. Karnasiewicz initially had concluded that Apostolides had caused the plaintiff's injury by improper retraction of the nerve, but subsequently changed his opinion. Apostolides disagreed with this theory because, in his view, the nerves have some elasticity and other structures in the area make it anatomically impossible to pull the lumbar nerves to that extent without causing other damage that the plaintiff did not suffer. Apostolides thought that any injury must have occurred during the drilling, but he could not say what the exact mechanism was because he did not see any bone shards or the drill enter the dura. Apostolides, Camel and Karnasiewicz all stated that the plaintiff's injury was not a result of the drill entering the dura because the spinning drill bit would have shredded it, wrapped up the nerve roots therein, and caused more severe injuries than those incurred by the plaintiff. Karnasiewicz also testified that the nerve rootlets could have been injured during surgery without any breach of the standard of care.

In Camel's view, the rent, which was small, was caused by a bone shard that came loose during the drilling, rather than by the drill bit entering the spinal canal. The "V" shape was an indication that it was caused by a bone shard, and not the drill bit or the rongeur. Camel also testified that the dural tear by itself would not have caused the plaintiff's problems, and that the bone shard is what had irritated the nerve roots. He also opined that the plaintiff's foot symptoms were likely unrelated to the surgery because they had not manifested immediately. Camel testified that the plaintiff's foot pain probably was the result of causalgia, which is a sympathetic nervous response to the previous lumbar nerve problems caused by the herniated disc, and not the surgery.

[6] The L4 nerve roots that were affected by the plaintiff's herniated disc do not serve the buttock, bladder or genital areas.

and also that Apostolides had retracted the L4 nerve root improperly. The plaintiff filed numerous motions in limine seeking to preclude the admission of documentary or testimonial evidence pertaining to informed consent, and any discussion or argument pertaining to his injuries as a " 'risk of the procedure.' " The trial court, *Radcliffe, J.*, however, denied these motions and admitted this evidence when the case was tried to the jury, which rendered a verdict in favor of the defendants.[7] Thereafter, the trial court denied the plaintiff's motion to set aside the verdict, and rendered judgment for the defendants in accordance with the jury's verdict. This appeal followed.

On appeal, the plaintiff claims that the trial court improperly denied his motions in limine to preclude, and overruled his objections to, the admission of evidence that included: (1) testimony by Camel that he had informed the plaintiff that nerve damage was a risk of the microdiscectomy; and (2) notes to that effect from the preoperative consultation between the plaintiff and Camel. The plaintiff contends that this evidence was irrelevant with regard to the medical malpractice claim, and that, even if relevant, the evidence was inadmissible under § 4-3 of the Connecticut Code of Evidence[8] because its confusing and prejudicial effects exceeded its probative value. In response, the defendants claim that this evidence was proof of risk and, therefore, relevant to prove that malpractice did not

[7] According to the interrogatories, the jury specifically found that Apostolides did not improperly retract the L4 nerve root, and that Camel did not: (1) fail to control the high-speed drill; (2) use the drill without the appropriate level of skill; (3) fail to discontinue the use of the drill as he neared the dura; or (4) improperly retract the L4 nerve root.

[8] Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

necessarily occur because a dural tear and arachnoiditis may occur with even a properly performed microdiscectomy. The defendants also contend that any impropriety was rendered harmless by the cumulative nature of the evidence, as well as the trial court's jury instructions. We conclude that the trial court improperly admitted this evidence, but that the impropriety was harmless.

The record reveals the following additional facts and procedural history. After hearing argument on multiple days of trial about the issues raised by the plaintiff's motions in limine, the trial court concluded that evidence of the risks of the procedure was relevant with regard to whether the plaintiff had proven that his injuries were the result of a breach of the standard of care. The trial court acknowledged that Camel himself could testify about the risks of the procedure. The trial court also, however, concluded that because there was no claim of lack of informed consent in this case; see footnote 3 of this opinion; evidence about whether the plaintiff understood the risks "could cause confusion and could lead a jury to think that [the] fact that someone had signed this; he had somehow consented to it or assumed the risks." Thus, the trial court determined that evidence that the plaintiff had understood the risks of the procedure was both irrelevant and could have prejudice exceeding its probative value. Indeed, the trial court emphasized that it would not permit the words "informed consent" to be used.

The trial court, therefore, refused to admit the hospital's consent form into evidence. The court did, however, admit Camel's testimony and the office consultation notes, but only after ordering redacted portions of those notes indicating that the plaintiff understood the risks of the procedure as explained to

him.[9] Finally, at a subsequent argument on this issue, the trial court also noted that the risk of prejudice would be mitigated because it would charge the jury "that simply because something is a risk in the procedure, and it happens, doesn't mean that the defendant is not liable in the event of the breach in the standard of care."

Thus, on appeal, the plaintiff first challenges the admissibility of Camel's testimony that he had informed the plaintiff of the risks of the surgery, including "the risk of infection, which is present in every operation; the small and remote risk of bleeding that requires transfusion; weakness in the legs; numbness; bowel and bladder dysfunction; [cerebral spinal fluid] leak, which really means a postoperative [cerebral spinal fluid] leak; and instability. Instability occurs after discectomy rarely, but more commonly occurs in the mid or higher lumbar sites at L3-4 and L2-3 because unlike the models which we'll see or you have seen each level is not exactly the same. The anatomy changes. The relationship of the joints to the disk space change. And so that in an L3-4 disk herniation there is a higher risk that you are going to remove part of the facet joint. And that— when you have a patient with a disk herniation and you have to remove part of the facet joint there is a risk of instability. If you develop instability other symptoms can occur like back pain and leg pain. And often times when the instability is traumatic, after surgery then patients need another operation, which is the reason why we talk about it and that's called a lumbar fusion."[10]

[9] The redacted portions of Camel's notes stated that the plaintiff understood the following: "The patient understands that no guarantee may be made regarding the results of surgery," as well as: "Understanding the above and also understanding the alternative of further conservative therapy, the patient wishes to proceed with surgery."

[10] Thereafter, the plaintiff recalled as a rebuttal witness Barbara Hayes, who had been present at that consultation. She contradicted Camel's testimony, and stated that he had not informed the plaintiff of those risks.

The plaintiff also challenges the trial court's admission into evidence of the redacted version of Camel's notes from his November 30, 1998 consultation with the plaintiff. Those notes, as redacted, state in relevant part: "We discussed the rationale for microdiscectomy at the L3-4 level. . . . The risks of surgery were discussed among which include infection, bleeding, weakness, numbness, bowel and bladder dysfunction, and [cerebral spinal fluid] leak, and instability. . . ."[11]

"The law defining the relevance of evidence is well settled. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . The trial court has wide discretion to determine the relevancy of evidence . . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 332, 838 A.2d 135 (2004); see also Conn. Code Evid. § 4-1 (" '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence").

Our relevance determination begins with the well established elements of a medical malpractice claim,[12]

---

[11] The notes also state that the plaintiff "was initially evaluated on [September 25, 1998] for a right L3-4 disc herniation with primarily right L4 root symptoms. He has been attending physical therapy but has not experienced significant relief of his symptoms. He continues to complain of right lower back and hip pain which is made worse by standing. He is here to discuss the option of surgery."

[12] "[P]rofessional negligence or malpractice . . . [is] defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . Furthermore, malpractice presupposes some improper conduct in the treatment or operative skill [or] . . . the failure to exercise requisite medical skill . . . ."

which require the plaintiff to prove by a preponderance of the evidence: "(1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, the plaintiff must present expert testimony in support of a medical malpractice claim because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons." (Internal quotation marks omitted.) *Carrano* v. *Yale-New Haven Hospital,* 279 Conn. 622, 656, 904 A.2d 149 (2006). Having reviewed the record in the present case, we conclude that the trial court correctly determined that whether the plaintiff understood or assented to the risks of the medical procedure bears no relevance to whether the treating surgeon complied with the standard of care. We also conclude that the trial court did not abuse its discretion when it determined that the evidence of the inherent risks of a particular surgical procedure is relevant to the determination of whether a breach of the standard of care occurred, and also whether such a breach caused the plaintiff's injuries. This is because evidence of whether an injury might well happen even in the absence of negligence, certainly has a " 'logical tendency to aid the trier in the determination of an issue' "; *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.,* supra, 267 Conn. 332; specifically whether a breach of the standard occurred or was the cause of the harm to the plaintiff.[13]

Nevertheless, "[a]lthough relevant, evidence may be excluded by the trial court if the court determines that

(Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital,* 272 Conn. 551, 562, 864 A.2d 1 (2005).

[13] We note that admitting evidence of the risks of a surgical procedure in this manner implicates hearsay issues in that it involves the admission of out-of-court statements for the truth of the matter asserted therein. See, e.g., Conn. Code Evid. §§ 8-1 (3), 8-2. We need not, however, address the hearsay implications of this evidence because the plaintiff did not object, and the trial court did not rule, on this basis.

the prejudicial effect of the evidence outweighs its probative value. . . . [T]he trial court's discretionary determination that the probative value of evidence is . . . outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 735–36, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); see also Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence").

We have not previously had the opportunity to consider whether evidence of the risks of a medical procedure, as communicated to a patient by a physician, is unduly prejudicial or confusing under § 4-3 of the Connecticut Code of Evidence in a medical malpractice action that does not include a claim of lack of informed consent.[14] Our sister state courts that have considered

---

[14] We acknowledge that in *Viera* v. *Cohen*, 283 Conn. 412, 452–53, 927 A.2d 843 (2007), a recent medical malpractice case that did not contain a claim of lack of informed consent, we rejected the *defendant physician's* claim that the trial court improperly had admitted evidence that he had not informed the plaintiff patient of the risks associated with delivering her baby vaginally, rather than via cesarean section. We concluded that this evidence was relevant to the plaintiff's claim that "the defendant had failed to recognize that [the plaintiff's] delivery presented a risk of shoulder dys-

this issue uniformly have concluded that evidence of informed consent, such as consent forms, is both irrelevant and unduly prejudicial in medical malpractice cases without claims of lack of informed consent. For example, the Virginia Supreme Court recently concluded that the trial court improperly denied the plaintiff patient's motion in limine to preclude the admission of evidence of discussions between herself and the defendant physician about the risk of bladder injury during a cystoscopy. *Wright* v. *Kaye*, 267 Va. 510, 528–29, 593 S.E.2d 307 (2004). The court stated that the plaintiff's "awareness of the general risks of surgery is not a defense available to [the defendant] against the claim of a deviation from the standard of care. While [the plaintiff] or any other patient may consent to risks, she does not consent to negligence. Knowledge by the trier of fact of informed consent to risk, where lack of informed consent is not an issue, does not help the plaintiff prove negligence. Nor does it help the defendant show he was not negligent. In such a case, the admission of evidence concerning a plaintiff's consent could only serve to confuse the jury because the jury could conclude, contrary to the law and the evidence, that consent to the surgery was tantamount to consent to the injury which resulted from that surgery. In effect, the jury could conclude that consent amounted to a waiver, which is plainly wrong." Id., 529.

Similarly, the Ohio Court of Appeals has noted that, although evidence of the risks of the procedure at issue

tocia. If, as the plaintiff's experts had testified, the standard of care would have obligated the defendant to discuss the risks of vaginal delivery with [the plaintiff], his failure to do so would provide evidence that he had not in fact recognized that those risks were present." Id., 453. *Viera* is, therefore, distinguishable from the present case, because the informed consent evidence proffered therein was directly relevant to the central issue in that case, namely, whether *the defendant* had been negligent by failing to recognize and respond to the risks of delivering a very large baby vaginally, rather than surgically.

are relevant in a medical malpractice case, evidence of whether the plaintiff patient had given informed consent to that procedure generally is irrelevant and "carrie[s] great potential for the confusion of the jury" in an action wherein only medical malpractice is pleaded, and the information given to the plaintiff is not at issue. *Waller* v. *Aggarwal*, 116 Ohio App. 3d 355, 357–58, 688 N.E.2d 274 (1996); cf. *Liscio* v. *Pinson*, 83 P.3d 1149, 1156 (Colo. App. 2003) (trial court did not improperly admit evidence of informed consent discussion when plaintiff patient had "opened the door" by asking defendant physician "whether a patient's signing a consent form relieved a doctor of the obligation to properly perform surgery or precluded the patient from bringing suit"), cert. denied, 2004 Colo. LEXIS 70 (February 9, 2004).

We conclude that the trial court abused its discretion when it admitted evidence of the risks of the microdiscectomy in the form of their disclosure to the plaintiff. The admission of evidence that Camel had told the plaintiff of those risks, namely, his testimony and the office notes to that effect, implicates the concerns about jury confusion raised by our sister state courts that have considered the issue of the admissibility of informed consent evidence in medical malpractice cases without informed consent claims. See Conn. Code Evid. § 4-3. Put differently, admission of testimony about what the plaintiff specifically had been told raised the potential that the jury might inappropriately consider a side issue that is not part of the case, namely, the adequacy of the consent. Indeed, this potential was further increased in this case because of the rebuttal testimony of Barbara Hayes, which disputed what Camel had told the plaintiff. See footnote 10 of this opinion. Thus, although evidence of the risks of a surgical procedure is relevant in the determination of whether the standard of care was breached, it was unduly prejudicial to admit such

evidence in the context of whether and how they were communicated to the plaintiff. Rather, such evidence is properly admitted, without this risk of confusion and inappropriate prejudice, in the form of, for example, testimony by the defendants or nonparty expert witnesses about the risks of the relevant surgical procedures generally. See *Waller* v. *Aggarwal*, supra, 116 Ohio App. 3d 358 (theory that "bladder injuries may occur during laparoscopic procedures in the absence of negligence . . . could easily be demonstrated without confusion through the testimony of an expert, rather than through the introduction of the consent form"). Accordingly, we conclude that the trial court improperly admitted the challenged evidence pertaining to whether the risks of the procedure were communicated to the plaintiff.

This conclusion does not, however, end our inquiry, because "[e]ven when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Finally, the standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely] would [have] affect[ed] the result."[15] (Citations omitted; internal quotation marks omitted.) *Ryan Transportation, Inc.* v. *M & G Associates*, 266 Conn. 520, 530, 832 A.2d 1180 (2003); accord *Prentice* v. *Dalco Electric, Inc.*, 280

---

[15] "[I]n the context of a harmless error analysis, it is not enough that there was other evidence in the record to support the jury's verdict. . . . [W]e specifically rejected such a standard in *Swenson* v. *Sawoska*, [215 Conn. 148, 153, 575 A.2d 206 (1990)], in which we concluded that the 'sufficient other evidence standard . . . is too restrictive in that it does not encompass situations where the erroneously admitted evidence, while not necessary itself to sustain the jury's verdict, may nonetheless have affected the jury's perception of the remaining evidence.' " *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 359, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007).

Conn. 336, 358, 907 A.2d 1204 (2006) (same), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 Ed. 2d 230 (2007); *Dinan* v. *Marchand*, 279 Conn. 558, 567, 903 A.2d 201 (2006) (same). Moreover, an evidentiary impropriety in a civil case is harmless only if we have a "fair assurance" that it did not affect the jury's verdict.[16] *DeMarkey* v. *Fratturo*, 80 Conn. App. 650, 656, 836 A.2d 1257 (2003); accord *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006) (improper evidentiary ruling is harmless in criminal case if reviewing court has "fair assurance" that it did not "substantially affect" jury's verdict [internal quotation marks omitted]).

A determination of harm requires us to evaluate the effect of the evidentiary "impropriety in the context of the totality of the evidence adduced at trial." *Vasquez* v. *Rocco*, 267 Conn. 59, 72, 836 A.2d 1158 (2003). Thus, our analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the "improperly admitted evidence is merely cumulative of other validly admitted testimony." (Internal quotation marks omitted.) *Prentice* v. *Dalco Electric, Inc.*, supra, 280 Conn. 358; see also id., 360–61 (noting that during summation, plaintiff described issue encompassing improperly admitted scientific evidence as

---

[16] Inasmuch as neither party argues for a different harmless error standard in civil cases than the well established " '[likely] would [have] affect[ed] the result' " standard recently applied in *Prentice* v. *Dalco Electric, Inc.*, supra, 280 Conn. 358, and *Dinan* v. *Marchand*, supra, 279 Conn. 567, we apply that formulation in the present case, notwithstanding our recent adoption of a new "workable standard for harmless error review of erroneous evidentiary rulings in the context of criminal cases." *State* v. *Sawyer*, 279 Conn. 331, 354, 904 A.2d 101 (2006); see also id., 357 (improper evidentiary ruling is harmless in criminal case if reviewing court has "fair assurance" that it did not "substantially affect" jury's verdict [internal quotation marks omitted]).

" 'critical' " and emphasized that evidence); *Hayes* v. *Caspers, Ltd.*, 90 Conn. App. 781, 800, 881 A.2d 428 (cautionary instruction addressed prejudicial impact of expert's testimony that included arguably improper discussion of pending federal action), cert. denied, 276 Conn. 915, 888 A.2d 84 (2005); *Raudat* v. *Leary*, 88 Conn. App. 44, 52–53, 868 A.2d 120 (2005) (improperly admitted expert testimony was harmful error when it related to "central issue" in case, namely, condition of purchased horse); *DeMarkey* v. *Fratturo*, supra, 80 Conn. App. 656–57 (improperly admitted hearsay evidence about cause of motor vehicle accident was harmless because it was cumulative of properly admitted testimonial and diagram evidence). The overriding question is whether the trial court's improper ruling "affected the jury's perception of the remaining evidence." *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990).

Having reviewed the entire record in this case, we conclude that there is a fair assurance that this evidentiary impropriety was harmless and did not likely affect the jury's verdict. Although this evidence related to the central issue in this case, namely, whether Camel had breached the standard of care in his use of the high-speed drill to perform the microdiscectomy,[17] neither the plaintiff nor Camel mentioned in their summations that the plaintiff had been informed specifically of the risk of dural tears and postoperative neurological damage.[18] Thus, neither party apparently viewed this partic-

---

[17] Resolution of this issue, of course, turned on the jury's ultimate assessment of the credibility of the party and nonparty expert witnesses who had proffered multiple theories about what happened to the plaintiff. See footnote 5 of this opinion.

[18] Specifically, in his summation, the plaintiff relied on Avi Bernstein's testimony; see footnote 5 of this opinion; in support of his argument that "dural tears, if they're fixed right, really, they can't—they should be no problem; shouldn't cause paralysis, shouldn't cause permanent sacral nerve damage, shouldn't cause nerve loss."

The defendant argued in response that "if the plaintiff's expert tells you it's okay to use the drill, it's okay to tear the dura, then why isn't one plus

ular evidence as significant enough to mention it to the jury as a factor to consider in its deliberations, as they confined their arguments to the properly admitted evidence of the risks of the microdiscectomy generally.[19]

Moreover, the trial court's charge to the jury specifically addressed the relationship of surgical risk and negligence, and stated that "simply because a particular injury is considered to be a risk of the procedure does not mean that a physician is relieved of the duty of adhering to the appropriate standard of care and does not mean that because the injury was a risk of the

one two? Why isn't it okay, unfortunately, I know, why isn't it okay to have a nerve root injury when those two things occur, using the drill and tearing the dura. Why isn't it okay?

"And you know [why] their expert says it's not okay? Because something bad happened. Something bad happened. Well, you know what? That's not good enough. You don't make decisions about whether a doctor is going to be responsible for failing to abide by the standards of his profession by saying bad result.

"His Honor is going to tell you that a bad result does not equal malpractice, or words, something to that effect, and if you accept that a dural tear occurs even in a properly performed procedure, and if you accept that the location of these nerve rootlets are millimeters, less than two/three millimeters away from that dura, if you accept that and everybody agrees on that, and if you accept that a drill can't go into a dura without shredding it, which didn't happen in this case, then you must accept that this dural tear was not malpractice.

"You know, there was a discussion about arachnoiditis, and I hesitate to mention this [be]cause it's getting a little off track, but I just want to address for you that even if the plaintiff has arachnoiditis, which is this condition, this inflammatory condition, that that may lead to some pain, you have to remember that [Bernstein] says that arachnoiditis can result from a properly performed procedure. It is a consequence sometimes of a disc herniation. It is a consequence of a dural tear, a dural tear even occurring in the absence of malpractice. Meaning one of those risks that isn't warned about, one of those dural tears that occur when the doctor didn't [do] something wrong, didn't deviate from the standard of care."

[19] We note, however, our disagreement with the defendants' characterization of the improperly admitted informed consent evidence as "merely cumulative of other validly admitted testimony." (Internal quotation marks omitted.) *Prentice* v. *Dalco Electric, Inc.*, supra, 280 Conn. 358. Although there was testimony that dural tears are a risk of even a properly performed microdiscectomy; see footnote 5 of this opinion; the potential harm in this case comes not from the substance of the testimony, but rather, from the context in which it was admitted.

procedure injury did not result from a failure to conform to the standard of care."[20] Indeed, we note that the plaintiff specifically agreed with the correctness of this limiting charge when it first was proposed by the trial court,[21] and he did not request a more specific instruc-

[20] The entire section of this portion of the trial court's charge to the jury provided: "A doctor is not liable for a bad result if he has used reasonable care, skill, and treatment. A physician does not promise to cure a patient or to care for a patient free from all complications. He does not guarantee a successful result.

"What the law requires him to do is to use the care, skill, and treatment which doctors in his specialty, in this case certified neurosurgeons, ordinarily have and exercise. The fact that the result may not have been as favorable as hoped for by the plaintiff or by the doctor or that injury resulted in and of itself raises no presumption of a want of proper care, skill, and treatment because a complete cure cannot be assured or guaranteed.

"*Likewise simply because a particular injury is considered to be a risk of the procedure does not mean that a physician is relieved of the duty of adhering to the appropriate standard of care and does not mean that because the injury was a risk of the procedure injury did not result from a failure to conform to the standard of care.*

"Therefore, if you find that an injury suffered by the plaintiff . . . was a risk of the procedure in question, a [microdiscectomy], but you also find that one or both of the defendants failed to conform to the standard of care and that injury resulted from that failure, you must find for the plaintiff even though the injury was a risk of the procedure." (Emphasis added.)

[21] After the trial court initially had explained its understanding of the difference between the medical malpractice and lack of informed consent theories of liability, it concluded that the risks of the procedure were relevant evidence. The court then proposed to charge the jury that "the fact that the result might not be as favorable as had been hoped for by the patient or the doctor or that injury resulted in and of itself raises no presumption of a want of proper care, skill and treatment because a complete cure cannot be assured or guaranteed. Likewise, simply because a particular injury is considered to be a risk of the procedure—of a procedure does not mean that a physician is relieved of the duty to—of adhering to the appropriate standard of care. And it does not mean that because the injury was a risk of the procedure, injury did not result from a failure to conform to the standard of care." The court further stated that Camel's notes had been redacted because "[t]here is no claim for comparative negligence either comparative negligence or through assumption of the risk. And there is no claim for informed consent. That is why much of that has been redacted and eliminated and simply a statement like that doesn't set the basis necessarily for a claim of informed consent."

In response, the plaintiff stated, "Judge, that really clarifies I think where the issue that I have is, in a narrow way. First of all, I want to be clear. I think the court has a firm handle on informed consent. The court clearly understands the parameters of informed consent. The court clearly under-

tion on this topic either before or after the trial court's charge to the jury, and did not take an exception to this aspect of the charge as given. Although the jury charge in this case was not tailored as specifically to the informed consent evidence as the limiting instruction that we recently discussed in *Viera* v. *Cohen*, 283 Conn. 412, 454 n.19, 927 A.2d 843 (2007),[22] it nevertheless properly informed the jury that inherent surgical risks, whatever they may be, do not relieve a surgeon of his or her responsibility to adhere to the relevant standard of care. We presume that the jury followed this instruction, thereby mitigating the prejudice and

stands that one of the aspects of informed consent is telling a patient about the risks of the procedure. The parameters of those risks are measured by a lay standard, but the obligation to do that is an obligation to the doctor. And the court understands equally that, that is not an issue for this case. It has not been [pleaded], it is not in and of itself material.

"I also think that the limiting instruction that the court has drafted is—I mean, I would probably like to hear it again or look at it, but it sounds *perfect, perfectly appropriate to me.* The—I guess, so now, what is the narrower issue that the plaintiff has with this? It is that it is the latter—I don't understand, although I understand saying that the risks—that by [Camel] telling [the plaintiff] about the risks of the procedure, if true I don't understand what probative value that has first in what the standard of care is, and second in any of the issues of causation in this case meaning that the jury has to decide based on all of the evidence what likely caused [the plaintiff's] injury in this case. So it would be improper for the jury to conclude, I think as the court's charge pretty much says, that the injury was caused because it was a risk of the procedure or was a risk of the procedure. That would be an improper evidence in which to base a decision." (Emphasis added.)

The plaintiff emphasized, however, that, even with the instruction, the evidence would be irrelevant and prejudicial because "I don't know what use this jury can make other than speculation, confusion, and the strong likelihood of prejudice against—because we don't have assumption of the risk and because they will see that and say, 'What is he complaining about? He was told.' "

[22] In *Viera* v. *Cohen*, supra, 283 Conn. 453, we concluded that, although informed consent was not a claim in the case, the proffered informed consent evidence nevertheless was relevant and properly admitted. We also, however, emphasized that "the trial court expressly instructed the jury that informed consent was not at issue in the case"; id., 454; when it charged: " '[T]here was no evidence of written consent. And I further instruct you that it is immaterial for your consideration whether or not . . . [the plaintiff] agreed to a procedure or a plan.' " Id., 454 n.19.

risks of inappropriate inferences attendant to this improperly admitted evidence of informed consent. See, e.g., *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 335. Accordingly, we are left with a fair assurance that the trial court's improper evidentiary ruling was not likely to have affected the jury's verdict in the present case.

The judgment is affirmed.

In this opinion the other justices concurred.