******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DINARDO SEASIDE TOWER, LIMITED *v.* SIKORSKY
AIRCRAFT CORPORATION
(AC 35510)

DiPentima, C. J., and Lavine and Dupont, Js.

*Argued February 4—officially released September 23, 2014*

(Appeal from Superior Court, judicial district of
Waterbury, Complex Litigation Docket, Shaban, J.)

*J. Christopher Rooney*, with whom were *Anne D.
Peterson* and, on the brief, *Kurtis Z. Piantek*, for the
appellant (plaintiff).

*Edward V. O'Hanlan*, with whom were *Thomas J.
Donlon* and *Michele Maresca*, for the appellee
(defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiff, DiNardo Seaside Tower, Ltd., appeals from the judgment rendered in favor of the defendant, Sikorsky Aircraft Corporation, following a twenty-three day jury trial. On appeal, the plaintiff claims that the trial court (1) improperly granted the defendant's motion for a directed verdict as to the second count of the complaint alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., (2) improperly charged the jury, and (3) committed harmful error in a number of evidentiary rulings. We are not persuaded by these claims of impropriety, and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of the plaintiff's appeal. This action arose out of a lease between the parties concerning certain industrial property owned by the plaintiff in Bridgeport. The lease commenced on November 23, 1987, whereby the defendant agreed to occupy buildings consisting of approximately 220,000 square feet with an initial annual rental fee of $1.2 million dollars. The defendant was responsible for payment of all property taxes, sewer use charges and public utilities charges and for maintaining security.[1]

In April, 2000, the defendant notified the plaintiff that it intended to "complete" the lease at the end of the year. In a December 30, 2000 completion agreement signed by the parties, the defendant agreed to make payments pursuant to the terms of the lease covering the time period of January 1, 2001, through November 30, 2002. The parties agreed that the defendant had satisfied all of the conditions for the return of the leased property, subject to a few minor duties that the defendant agreed to perform.

In 2001, the defendant needed space to manufacture H-66 Comanche helicopters for the United States Army. On March 1, 2002, the parties executed "AMENDMENT NO. 3 TO LEASE AGREEMENT" (third amendment), which terminated the completion agreement and ratified, adopted and restated the provisions of the lease agreement between the parties, except as expressly amended by the terms of third amendment. The third amendment extended the terms of the lease until November 30, 2007. From March, 2002, through November, 2002, the monthly rent was $100,000, and for the balance of the lease the monthly rent increased to $110,000. Paragraph 6 of the third amendment provided: "[The defendant] may, at [the defendant's] option and at [the defendant's] sole cost and expense, construct the improvements to the Premises ("the [defendant] Improvements") described in the plans and specifications to be attached hereto and made a part hereof as

*Exhibit A* in a mutually agreeable form by [the plaintiff] and [the defendant]. Such plans and specifications shall be attached hereto within sixty (60) days after execution hereof. After completion of the [defendant] Improvements, such [defendant] Improvements shall be deemed as part of the Premises and not subject to restoration or removal upon expiration or termination of the Lease term.

"Notwithstanding any provision to the contrary contained herein or in the Lease, upon completion of the Phase I and Phase II [defendant] Improvements (as delineated and set forth on Exhibit A), such [defendant] Improvements (other than [the defendant's] furniture, equipment and removable trade fixtures) shall become property of [the plaintiff] and [the defendant] shall not be required to remove or restore the Factory Area [defendant] Improvements (as delineated and set forth on *Exhibit A*) at the end of the Lease term, *provided*, *however*, that [the plaintiff] may, by written notice to [the defendant] at least sixty (60) days prior to the end of the Lease term, designate any or all of the Factory Area [defendant] Improvements to remain as property of the [plaintiff] and not be removed or restored at the end of the Lease term, as such term may be extended." (Emphasis in original.)

The defendant proceeded to modify the interior of the property, including the construction of office space with workstations that required electric, data and telephone wires. The defendant gained the approval of the plaintiff to replace the existing 90 ton chilled water air conditioning system with a 270 ton version, but due to budgetary concerns, elected to install a direct expansion (DX) air conditioning system.

In 2004, the Army canceled the Comanche helicopter program. The defendant's lease obligation, however, did not terminate until the end of 2007. As the end of the lease approached, Alan David Mortensen began to review the condition of the property on behalf of the plaintiff. Specifically, in the summer of 2007, Mortensen took photographs of the parking lot and building exteriors. Later, he conducted a walk through of the buildings with representatives of the defendant. On September 28, 2007, Mortensen drafted a memo with attached photographs of the walk through. Mortensen indicated in this report that many certifications and records of testing were either missing or expired. With respect to the exterior of the building, Mortensen determined that the parking lot, catch basins and curbs were in need of repair; specifically, the cracks needed to have weeds removed and be filled and the parking lots lines needed to be redone. Mortensen also noted that the building exterior was in need of repair; namely, the windows and frames were in poor condition and the DryVit stucco exterior was fractured and sagging. Mortensen further indicated that the telephone switch and the data/voice

and power infrastructure had been removed from the building and that a DX air conditioning system had been installed rather than the chilled water system approved by the plaintiff.

The plaintiff sent various notices to the defendant regarding its assessment of the condition of the property. Representatives of both parties attended a meeting on November 29, 2007, just prior to the expiration of the lease, regarding the plaintiff's concerns regarding the condition of the property. At that meeting, no one on behalf of the defendant offered to address or remedy the plaintiff's issues. Two days later, the plaintiff acknowledged the receipt of the keys to the property but rejected the defendant's attempted surrender of the premises.

In 2009, the plaintiff commenced the present action with a two count complaint. Count one alleged that the defendant had breached the terms of the lease agreement. Specifically, the plaintiff alleged that the defendant improperly had removed telecommunications, data and electrical power wiring, had cut wires, had disabled the telephone system to the point that a replacement was necessary, had disabled the energy management, security and fire alarm systems that had been connected to an off-site property owned by the defendant, had disabled the card access aspect of the security system, had removed security cameras and had cut various pipes throughout the building. The plaintiff further alleged that, in breach of the lease agreement, the defendant had failed to maintain the property, including failing to clean and caulk thermal windows, which allowed water to damage the building and caused the DryVit stucco exterior to fail, and failing to maintain the parking lot and sidewalks. Finally, the plaintiff claimed that employees of the defendant had vandalized the interior of the buildings and removed property belonging to the plaintiff.

In count two of the complaint, the plaintiff alleged that the conduct of the defendant constituted a violation of CUTPA. Specifically, it claimed that the intentional destruction of the property constituted an unfair trade practice and was done with malice toward the plaintiff and/or to prevent another occupant from using the property.

During the trial, the defendant presented evidence that the air conditioner it had installed was less expensive, but either system would "do a fine job." Additionally, its evidence contradicted the plaintiff's contention that the plaintiff's approval was necessary to replace the air conditioning system. The defendant also produced evidence that would permit the jury to conclude that the terms of the lease permitted the defendant to remove its equipment, furniture and trade fixtures, namely, the modular furniture from the office space work stations and the associated wires that supplied those stations.

The defendant also produced evidence that abandoned data wiring needed to be removed because it constituted a fire and structural hazard and that new tenants often preferred to install their own wiring to meet the needs of their particular business. Finally, the defendant noted that the terms of the lease placed the maintenance of the DryVit stucco exterior with the plaintiff.

At the conclusion of the plaintiff's case, the defendant moved for a directed verdict with respect to both counts. The court reserved judgment on the motion in accordance with Practice Book § 16-37.[2] At a later date, the court requested the parties to submit case law addressing whether leasing of the property was part of the defendant's trade or commerce. After considering the materials submitted by the parties, the court granted the defendant's motion for a directed verdict with respect to the CUTPA count. Specifically, the court determined that the plaintiff had failed to establish that the defendant was in the trade or commerce of renting or leasing properties and its "true business" was the manufacture and servicing of aviation equipment. The defendant's act of leasing property was "incidental to its primary trade or business." During its charge, the court directed the jury to enter a verdict on the CUTPA count in favor of the defendant.

After deliberating, the jury returned a verdict for the defendant as to both counts. The jury noted in an interrogatory that the plaintiff had not proven that the defendant had breached the lease. The plaintiff moved to set aside the verdict, arguing that the court improperly charged the jury and that the verdict was against the weight of the evidence. The court denied the plaintiff's motion, and this appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court improperly directed the verdict in favor of the defendant with respect to the second count of the complaint alleging a CUTPA violation. Specifically, the plaintiff argues that (1) the court's reliance on law limiting the applicability of CUTPA to the defendant's primary trade or business was misplaced, (2) the court improperly raised this question sua sponte, and (3) even if it were required to show that the defendant's primary trade of business was leasing commercial real estate to invoke CUTPA, sufficient evidence existed for the jury to so find. For these three reasons, it argues, the court should not have granted the defendant's motion for a directed verdict. We are not persuaded by the plaintiff's arguments.

Before turning to the specifics of the plaintiff's claim, we identify the relevant legal principles and our standard of review. "Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our

review is plenary. . . . Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Ibar* v. *Stratek Plastic Ltd.*, 145 Conn. App. 401, 410, 76 A.3d 202, cert. denied, 310 Conn. 938, 79 A.3d 891 (2013); see also *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 512–13, 43 A.3d 69 (2012). We note, however, that a "*verdict may be directed where the decisive question is one of law* or where the claim is that there is insufficient evidence to sustain a favorable verdict." (Emphasis added; internal quotation marks omitted.) *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, 115 Conn. App. 680, 693, 974 A.2d 764, cert. denied, 293 Conn. 916, 979 A.2d 488 (2009).

Having identified our standard of review and the law applicable to the procedural posture of the case, we now address the applicable substantive law. "CUTPA provides: No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. General Statutes § 42-110b (a)." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 227, 990 A.2d 326 (2010). "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . [CUTPA] provides for more robust remedies than those available under analogous common-law causes of action, including punitive damages . . . and attorney's fees and costs, and, in addition to damages or in lieu of damages, injunctive or other equitable relief. . . . To give effect to its provisions, § 42-110g (a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Marinos* v. *Poirot*, 308 Conn. 706, 712–13, 66 A.3d 860 (2013).

Our Supreme Court has explained that "a party need not prove an intent to deceive to prevail under CUTPA." (Internal quotation marks omitted.) *Associated Investments Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 156, 645 A.2d 505 (1994); see also M. Taylor & D. Krisch, Encyclopedia of Connecticut

Causes of Action (2009), pp. 110–12. Finally, we note that the appellate courts of this state have stated that not every breach of a contract constitutes a CUTPA violation; see *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 228; *Hudson United Bank* v. *Cinnamon Ridge Corp.*, 81 Conn. App. 557, 571, 845 A.2d 417 (2004); and that the issue of whether CUTPA applies to a defendant is a legal question, but whether a defendant's actions constituted a deceptive or unfair trade practice is a question of fact. See *Szekeres* v. *Szekeres*, 126 Conn. App. 829, 841, 16 A.3d 713, cert. denied, 300 Conn. 939, 17 A.3d 475 (2011).

In its complaint, the plaintiff alleged that the defendant intended to disable the property for use by another occupant and this constituted a violation of CUTPA. Specifically, the plaintiff averred that the defendant had materials and infrastructure taken or destroyed and that this was done to ensure that the property could not be used by another tenant without the plaintiff having to expend significant amounts of money to effectuate repairs. The plaintiff also alleged that the defendant was in the trade or business of "renting facilities for the use of its various contracts and programs throughout the country and the world."

On October 17, 2012, at the conclusion of the plaintiff's case, the defendant made an oral motion for a directed verdict on both counts of the complaint. It argued that even intentional breaches of a contract do not constitute a per se violation of CUTPA. It then stated that there was no specific intent to disable the property or to prevent the plaintiff from renting it to another party. The court reserved judgment on the defendant's motion.

One week later, the court requested counsel for the plaintiff and the defendant to provide cases addressing whether the defendant's leasing of property was part of its trade or commerce. The court expressly stated that it did not want a memorandum of law and that it would not hear oral argument on this particular issue; it only wanted copies of any applicable cases. It then stated: "So, I'll repeat it, just to be clear: that I'm not going to be doing any oral argument, just if you can find any authority—and, again, based on the facts of this case, whether [the defendant's] leasing of the property is part of the [defendant's] trade or commerce. I just want cases printed out. And, obviously, you should have cases for other counsel—copies for other counsel as well." Neither party objected to the course of action taken by the court.

On October 26, 2012, following an in-chambers charging conference, the court informed counsel that it would grant the defendant's motion for a directed verdict with respect to the CUTPA count. The plaintiff's counsel noted his objection to the case law relied upon by the court in directing the verdict as contrary to the remedial

purpose of CUTPA and erroneous under the plain language of the CUTPA statute and its legislative history. On November 1, 2012, the court expounded on its reason for directing the verdict on the record. "A CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce, and for that our Appellate Court has weighed at—through *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, [93 Conn. App. 486, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006)]. In making a determination as to whether a defendant is subject to CUTPA and has committed a violation thereof, it must first be determined whether the defendant's actions were carried out in the defendant's trade or commerce. . . . The conduct at issue must occur in the defendant's primary trade or business; it must not be merely incidental to the defendant's trade or business.

"In this case the plaintiff alleges that the defendant is in the trade or business of renting facilities for the use of its various contracts and programs throughout the country and the world. . . . The evidence presented at trial was sufficient to establish the defendant is a corporation which manufactures and services aviation equipment, including helicopters. The defendant has other facilities which it either rents or owns for that purpose. . . . However, having considered all of the evidence in the light most favorable to the plaintiff, including any reasonable inferences which may be made, it is the court's determination that the plaintiff has failed to establish that the defendant is in the trade or commerce of renting or leasing properties. It is clear that the manufacture and servicing of aviation equipment is the primary trade or business of the defendant, or put another way, its true business. The act of leasing the property from the [plaintiff] is incidental to its primary trade or business. . . .

"Now the evidence presented fails to make out a prima facie case in support of both the evidence needed to present the claim to the jury for its consideration and that needed to establish a necessary element to bring the claim under CUTPA. Accordingly, as to the second count of the complaint, as a matter of law, the plaintiff has no claim under CUTPA as the defendant's conduct in leasing or vacating the property is not part of the defendant's trade or commerce within the meaning of that statute. As a result, the court will, as part of its instructions to the jury, direct the jury to return a verdict in favor of the defendant as to the second count."[3]

A

The plaintiff's primary argument is that the trial court followed decisions from this court that were not controlling and improperly interpreted CUTPA to limit the application of that statute to instances where the defen-

dant's unfair or deceptive act occurred in the conduct of its primary trade or commerce. We are not persuaded by this argument.

The starting point for our discussion is *Arawana Mills Co.* v. *United Technologies Corp.*, 795 F. Supp. 1238 (D. Conn. 1992), where the United States District Court of Connecticut granted in part a motion to dismiss. The defendant in that case, United Technologies Corporation, leased property from the plaintiff, Arawana Mills Company. Id., 1240. The plaintiff alleged in its complaint that the defendant had spilled, leaked and discharged hazardous substances into the soil and groundwater, causing contamination in violation of federal and state law. Id., 1241. The ninth count of the complaint alleged a violation of CUTPA. Id., 1252. The defendant argued that the complaint failed to state a claim upon which relief could be granted because it was not in the trade of leasing property and, therefore, could not be liable under CUTPA. Id. The District Court acknowledged that the act of leasing this property was incidental to the defendant's true business of repairing and servicing aircraft engines. Id., 1253. It concluded that the plaintiff "has no claim under CUTPA against [the defendant] for [its] conduct in leasing the Property, because leasing property is not this defendant's 'trade or commerce' within the meaning of CUTPA." Id.; see also *Sealy Connecticut, Inc.* v. *Litton Industries, Inc.*, 989 F. Supp. 120, 127 (D. Conn. 1997) ("[w]hen a lessor seeks to impose CUTPA liability on a lessee, the key question is whether leasing property is defendant's trade or commerce" [internal quotation marks omitted]). Accordingly, the District Court granted the defendant's motion to dismiss the CUTPA count for failure to state a claim. *Arawana Mills Co.* v. *United Technologies Corp.*, supra, 1253.

This court applied the reasoning of *Arawana Mills Co.* in *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 486 (*McCann*). In that case, the plaintiffs entered into a contract with the defendants to purchase four acres of property. Id., 489. There were 10,000 gallons of water and oil in the basement of one of the buildings, and the plaintiffs learned that the oil had contaminated the concrete forming the basement and the surrounding soil. Id. Two and one-half years later, the Department of Environmental Protection ordered the plaintiff to remediate the soil. Id. The plaintiffs commenced an action against the defendants, alleging, inter alia, a violation of CUTPA. Id., 502. The trial court granted a directed verdict in favor of the defendants. Id., 489.

In addressing the decision to direct the verdict on the plaintiffs' CUTPA count in *McCann*, this court noted that the trial court had directed the verdict in favor of the defendants on the basis of "the 'as is' provision of the agreement and that the defendants had not relied

on [David M.] McDermott's representations. The [trial] court [had] concluded . . . that McDermott's misrepresentation was not the proximate cause of the plaintiff's loss." Id., 520. On appeal, however, the defendants argued that "to constitute a violation of CUTPA, the alleged offense must arise out of the offenders' primary trade or business . . . ." Id., 521. This court noted that this matter was not addressed by the trial court, but chose to review it nonetheless pursuant to its supervisory powers. Id., 521 n.30. Relying on the reasoning of *Cornerstone Realty, Inc.* v. *Dresser Rand Co.*, 993 F. Supp. 107, 111–12 (D. Conn. 1998), and *Arawana Mills Co.* v. *United Technology Corp.*, supra, 795 F. Supp. 1238, this court concluded "that a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 523. This court continued: "Because the defendants in this case were not in the business of selling real property, and the purchase and sale agreement at issue was merely incidental to the defendants' sale and servicing of automobiles, [this court] concluded that the [trial] court properly directed a verdict as to the plaintiffs' CUTPA count." Id.

This court next applied the primary trade or commerce principle in *Sovereign Bank* v. *Licata*, 116 Conn. App. 483, 977 A.2d 228 (2009), appeal dismissed, 303 Conn. 721, 36 A.3d 662 (2012) (cert. improvidently granted). This court iterated that a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or business. Id., 494. In *Sovereign Bank*, the substituted plaintiff was in the business of acquiring real estate, and not in the mortgage business. Id. "There was no evidence presented at trial that [the substituted plaintiff] ever had, prior to the transaction or thereafter, engaged in the mortgage business, nor did the defendant allege as much. The defendant's allegation [in her counterclaim] solely related to an ancillary transaction that was incidental to the [substituted plaintiff's] primary real estate business and thus fell outside the CUTPA penumbra." Id.; see also *Biro* v. *Matz*, 132 Conn. App. 272, 290, 33 A.3d 742 (2011) (sellers not in business of selling real property and therefore CUTPA inapplicable to transaction); see generally *Tzovolos* v. *Wiseman*, 51 Conn. Supp. 532, 579–81, 16 A.3d 819 (2007) (trial court rejected defendants' reliance on *McCann* and determined that their acts were within primary scope of their business and thus subject to CUTPA), aff'd, 300 Conn. 247, 12 A.3d (2011). Guided by these cases, we now turn to the specifics of the plaintiff's arguments.

In the present case, the plaintiff argues that the court improperly followed the reasoning that originated in the District Court's decision in *Arawana Mills Co.* and appeared as dicta in this court's decision in *McCann*. We disagree with the plaintiff's assertion that the analysis in

*McCann* limiting CUTPA to a primary trade or business constituted dicta.[4] Rather, it comprised the holding of that case. In *McCann*, this court took the rare step of using its supervisory powers to reach an issue not presented to the trial court and resolved the case on the basis that CUTPA claims cannot be alleged for activities that are incidental to an entity's primary business. *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 521 n.30. Simply put, this was the express holding of the case, and not dicta as claimed by the plaintiff. Additionally, this rationale also constituted the bases of our subsequent decisions in *Sovereign Bank* and *Biro* with respect to the CUTPA issues. Therefore, we conclude that the trial court in the present case properly followed the controlling and applicable precedent when it directed the verdict on the CUTPA count.[5]

B

The plaintiff also argues that the court improperly raised sua sponte this issue of the applicability of CUTPA. Specifically, it contends that it was improper for the court to raise this matter sua sponte at the conclusion of evidence. We are not persuaded.

As noted previously, while the motion for a directed verdict was pending and during the presentation of evidence, the court asked the parties to submit cases on whether leasing of the property was part of the defendant's trade or commerce. The court specifically stated that it did not want a memorandum of law, nor would it permit oral argument. Neither party voiced any objection to the court's request. The next day, October 25, 2012, both parties submitted cases to the court. Again, neither party objected, or requested the court to reconsider allowing a written memorandum of law or oral argument. On October 26, 2012, the court notified the parties that it would grant the defendant's motion for a directed verdict on the CUTPA count. It then allowed the plaintiff's counsel to state why reliance on *McCann* was improper.

We decline to review the merits of this claim. The plaintiff did not object to the procedure used by the court.[6] A conclusion that this was improper would amount to an ambush of the trial judge. See *State* v. *Moye*, 199 Conn. 389, 396, 507 A.2d 1001 (1986). "Practice Book § 60-5 provides in relevant part that [t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . Indeed, it is the appellant's responsibility to present a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily [the appellant] must raise in the trial court the issues that he intends to raise on appeal. . . .

For us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. . . . We have repeatedly indicated our disfavor with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal." (Internal quotation marks omitted.) *JPMorgan Chase Bank, N.A.* v. *Georgitseas*, 149 Conn. App. 796, 797–98, 89 A.3d 992 (2014); see also *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 265–66, 828 A.2d 64 (2003) (Supreme Court refused to engage in appeal by ambuscade when party failed to first present claim to trial court); *Dziedzic* v. *Pine Island Marina, LLC*, 143 Conn. App. 644, 654–55, 72 A.3d 406 (2013) (rules of practice require party, as prerequisite to appellate review, to distinctly raise claim before trial court).

In its brief, the plaintiff maintains that it was improper for the court to raise a new legal theory sua sponte and direct the verdict on that basis. The plaintiff objected six days after the jury had been charged, but did not include a specific challenge to the "primary business theory."[7] Our review of the record reveals that the plaintiff raised this issue for the first time in its appellate brief. The claim, therefore, is not presented properly for our review. Accordingly, we decline to review the merits of this claim.[8] See *Curtis* v. *Curtis*, 134 Conn. App. 833, 847, 41 A.3d 318 (2012).

C

The plaintiff's final argument challenging the directed verdict is that it presented sufficient evidence to show that the defendant's primary trade or business was leasing commercial real estate. Specifically, it argues that the evidence of the defendant's worldwide real estate holdings was sufficient for the jury to conclude that its real estate activities constitute an integral part of its business.

In count one of the complaint, the plaintiff alleged that the defendant's "principal business is the design, manufacture and overhaul of helicopters and their component parts for military and civilian use." In count two, the plaintiff incorporated that allegation and further alleged that the defendant "is in the trade or business [of] renting facilities for the use of its various contracts and programs throughout the country and the world."[9]

The plaintiff points to the testimony of Mortensen, an employee of the defendant for more than twenty years in its real estate department, that he personally had been involved in office renovations of one million square feet. Mortensen also testified that he inspected the defendant's facilities worldwide. The plaintiff also

relies on the testimony from John Luipold, whom it described in its appellate brief as an employee of the defendant.[10] Absent from the evidence, however, is the context in which to place this information. There was nothing to show how these real estate activities compared overall with the defendant's business. Thus, the evidence presented was insufficient to survive the motion for directed verdict. We conclude that the court properly directed the verdict on the CUTPA count.

## II

The plaintiff next claims that the court improperly charged the jury with respect to the plaintiff's breach of lease claim. Specifically, it argues that the court improperly (1) failed to charge the jury that any ambiguous or unclear language should be construed against the defendant as the drafter of the third amendment to the lease, and (2) failed to instruct the jury on the technical, legal definitions of "fixtures" and "trade fixtures." We are not persuaded by these arguments.

Initially, we identify the relevant legal principles and our well settled standard of review for this claim. "The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [W]e must determine whether the jury instructions gave the jury a reasonably clear comprehension of the issues presented for their determination under the pleadings and upon the evidence and were suited to guide the jury in the determination of those issues. . . . [I]n our task of reviewing jury instructions, we view the instructions as part of the whole trial. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Moreover, [a] refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance." (Internal quotation marks omitted.) *Umsteadt* v. *G. R. Realty*, 123 Conn. App. 73, 79, 1 A.3d 243 (2010). We also have stated: "Jury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . Our standard of review on this claim is whether it is reasonably probable that the jury was misled." (Internal quotation marks omitted.) *Nikiel* v. *Turner*, 119 Conn. App. 724, 726–27, 989 A.2d 1088 (2010); *Beckenstein* v. *Reid & Riege, P.C.*, 113 Conn. App. 428, 441, 967 A.2d 513 (2009). We now turn to the specific arguments raised by the plaintiff.

### A

The plaintiff first argues that the court improperly failed to charge the jury that any ambiguous or unclear language should be construed against the defendant as the drafter of the third amendment to the lease. The

following additional facts are necessary to review this claim. In its supplemental revised request to charge, dated October 26, 2012, the plaintiff provided the court with separate language to charge the jury if the court determined that the contract was clear and unambiguous, or if it concluded that it was ambiguous. If the contract was determined to be ambiguous, then the plaintiff proposed the following instruction: "When considering how to interpret an ambiguous term you should consider whether the word was introduced into the contract by one of the parties, meaning that they are the 'draftsman' of the language. You have also heard evidence that [the defendant] drafted or wrote the contract and amendments. In the case where one party is the author or draftsman, I instruct you that you are to construe the meaning of that contract term against the author of the contract, [the defendant]. In other words, you must give those terms the meaning supported by the evidence which is most favorable to the plaintiff. . . . Again, for example, if the contract were to say 'the sky is blue' and the shade of blue which applied was ambiguous, and the party drafting the term construed it to be limited to 'navy blue,' you are required to reject his narrow interpretation in favor of a broader view of the term put forth by the other party. In this case word '[Court to insert ambiguous term]' you should therefore construe that term as follows [language to be determined based upon evidence adduced]."

The court did not give the plaintiff's proposed instruction. The court provided the jury with a general instruction regarding the elements of a breach of contract claim. It then charged the jury that the parties had a dispute over the meaning of certain language in the contract and that "[t]o determine whether the contract meant what the plaintiff claims, you must decide whether it was the parties' intent to so provide. The first place to look to find the parties' intent is the wording that was used in the contract. Words in a contract are to be given their ordinary meaning. If you cannot determine what was intended from the language you may consider the circumstances surrounding the entering into the contract or other legal doctrines that I will provide to you in these instructions."

On November 7, 2012, the plaintiff filed a written objection to the court's instructions. It argued that the court should have incorporated the plaintiff's proposed jury charge. On November 28, 2012, the plaintiff moved to set aside the jury verdict. On March 1, 2013, the court issued a memorandum of decision denying the plaintiff's motion. It addressed the plaintiff's claim of error relating to the jury instructions. The first claim of error addressed by the court was the plaintiff's contention that once the court had determined that certain terms of the contract were ambiguous, it was required to identify those specific terms and instruct the jury that it was to resolve the ambiguity against the defendant as

the drafter of the contract. In rejecting this contention, the court stated: "The difficulty with [the] plaintiff's argument in this respect is twofold. First, the premise upon which the plaintiff bases this argument is flawed. The court made no decision or specific finding during the trial that the contract was ambiguous. The fact that a dispute existed over the terms of the contract does not automatically elevate the terms of the contract to the level of ambiguity. It simply means that the parties took and argued different positions as to the meaning of its terms."[11]

The court further reasoned that even if the contract contained ambiguous terms, the plaintiff's requested instruction regarding construing the ambiguity against the defendant as the drafter did not apply in this case. The plaintiff and the defendant both were sophisticated commercial entities and therefore this was not a situation with uneven bargaining or negotiating power on one side. "Here, the lease need not be interpreted against the drafter as it was not one born of adhesion." Last, the court concluded that even if the plaintiff's instruction should have been given, any such error was harmless. See *L'Homme* v. *Dept. of Transportation*, 72 Conn. App. 64, 71, 805 A.2d 728 (2002).

When the language in a contract is ambiguous, courts construe the ambiguity against the drafter. *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 13–14, 938 A.2d 576 (2008); see also *Montoya* v. *Montoya*, 280 Conn. 605, 616, 909 A.2d 947 (2006); *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 735, 873 A.2d 898 (2005). This doctrine sometimes is referred to as contra proferentem, and applies when the drafter of the contract has superior knowledge as compared to the other party. See *David M. Somers & Associates, P.C.* v. *Busch*, 283 Conn. 396, 405 n.10, 927 A.2d 832 (2007) (doctrine applies primarily in context of insurance contracts but also in contracts between attorney and client). *The doctrine, however, applies only after the court determines that the language in the contract is ambiguous*. As the court expressly stated in the memorandum of decision denying the plaintiff's motion to set aside the verdict, it did not find the contract to be ambiguous.

The plaintiff's appellate brief inaccurately assumes that the court found parts of the contract to be ambiguous. This flaw is fatal to its claims on appeal. While the court did instruct the jury that the parties disputed the meaning of certain terms contained in the contract, and that the jury was to determine whether the contract meant what the plaintiff contended, this is not equivalent to a judicial determination of an ambiguous contract. Our Supreme Court has stated that "[t]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quo-

tation marks omitted.) *Harbour Pointe, LLC* v. *Harbour Landing Condominium Assn., Inc.*, 300 Conn. 254, 264, 14 A.3d 284 (2011).

The plaintiff's appellate brief states that with respect to "those words which the court determined as a threshold issue were ambiguous; the court should have instructed the jury on the method by which the jury was to determine how to interpret these words." It argues that the court's instructions were misleading because it instructed the jury as if any or all of the words in the contract might be ambiguous. It then contends that as a result of the ambiguity found by the court, it should have instructed that such ambiguity should be construed against the defendant as the drafter of the contract. Thus, all of these arguments are founded on the plaintiff's assertion that the trial court determined that at least parts of the contract were determined to be ambiguous. The record reveals, however, that the trial court never made that threshold determination. It expressly disavowed that notion in the memorandum denying the plaintiff's motion to set aside the verdict. Absent that threshold conclusion, the plaintiff's appellate arguments must fail.

B

The plaintiff next argues that the court improperly failed to charge the jury regarding the definitions of the terms "fixtures" and/or "removable trade fixtures." The plaintiff contends that, pursuant to the lease, any improvements made by the defendant became the plaintiff's property, and the defendant was permitted to remove only its furniture, equipment and removable trade fixtures. The plaintiff maintains that the court's instructions were not detailed sufficiently to instruct the jury properly. We disagree.

The plaintiff filed a request to charge that specifically defined "fixture" and "removable trade fixture." The plaintiff also requested an instruction that if the jury found that the defendant removed certain items, such as panel walls with wiring, electrical power wires, telecommunication and data closets that served as central routing stations, energy management, telephone, security and fire alarm systems, and these items did not fall within the definitions of furniture, equipment, or removable trade fixtures, then it was required to find that the defendant breached the paragraph 6 of the third amendment.

The court declined to instruct the jury in accordance with the plaintiff's request. Instead it provided the following instruction: "To determine whether the contract means what the plaintiff claims, you must decide whether it was the parties' intent to so provide. The first place to look to find the parties' intent is the wording that was used in the contract. Words in a contract are to be given their ordinary meaning. If you cannot

determine what was intended from the language you may consider the circumstances surrounding the entering into the contract or other legal doctrines that I will provide to you in these instructions."

In its memorandum of decision denying the motion to set aside the verdict, the court noted that "[d]uring the trial there was a significant amount of testimony presented by both parties as to what items were considered fixtures and/or trade fixtures and to whether various items claimed by either party fell into those categories. There were also repeated references to the provisions of the lease containing those terms through both testimony and physical exhibits." The court further observed that the jury never indicated that they had any difficulty with these terms and that it would not presume confusion or error on the part of the jury.

After reviewing the record and the parties' briefs, we conclude that the court's instructions were proper. The instructions fairly presented the case in such a way that injustice was not done to either party and sufficiently guided the jury. *McDermott* v. *Calvary Baptist Church*, 263 Conn. 378, 383–84, 819 A.2d 795 (2003); see also *Perez* v. *Cumba*, 138 Conn. App. 351, 366, 51 A.3d 1156, cert. denied, 307 Conn. 935, 56 A.3d 712 (2012). Furthermore, we are not persuaded by the plaintiff's unsupported assertion that without instruction of these terms, "the jury did not properly understand the plaintiff's claims of damages due to [the defendant's] removal or whether [the defendant's] claim that it removed only items which it was permitted to under the lease, a necessary predicate finding to the defendant's verdict the jury returned." Put another way, the plaintiff has not established any harm as result of the court's instructions. See *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 448, 782 A.2d 87 (2001).

### III

The plaintiff's final claim is that the court committed harmful error in a number of evidentiary rulings. Specifically, the plaintiff argues that it improperly failed to admit into evidence certain photographs and improperly admitted various letters written by the defendant's trial counsel to the plaintiff. We are not persuaded.

As an initial matter, we set forth the legal principles applicable to this claim. "[O]ur standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *Lappos-*

*tato* v. *Terk*, 143 Conn. App. 384, 401, 71 A.3d 552, cert. denied, 310 Conn. 911, 76 A.3d 627 (2013).

The plaintiff also must show that it was harmed by an improper evidentiary ruling. "[B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Moreover, an evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict. . . . A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial." (Citation omitted; internal quotation marks omitted.) *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 254–55, 9 A.3d 364 (2010); see also *Hayes* v. *Camel*, 283 Conn. 475, 488, 927 A.2d 880 (2007).

A

We first address the plaintiff's claim regarding photographs that the court did not admit into evidence. The plaintiff's arguments regarding the photographs may be placed in three categories: (1) The court improperly failed to admit 165 photographs into evidence; (2) the court improperly failed to admit photographs into evidence that depicted red tape with the words "Electrical Line"; and (3) the court improperly failed to admit miscellaneous photographs into evidence for a variety of reasons. We address each in turn.

1

We first address the plaintiff's claim regarding 165 photographs and summarize the twisted path these photographs travelled before the court ultimately denied the plaintiff's attempt to have them admitted into evidence. Early in the trial, during Peter DiNardo's testimony, the plaintiff sought to introduce exhibit 94, a memorandum and spreadsheet created by Mortensen in September, 2007, with attached photographs. This document described a "walk-around" of the property by David Nash, Joseph Sadak, Peter DiNardo and Mortensen. In objecting to this exhibit, the defendant's counsel argued that the version of exhibit 94 produced during discovery did not contain color photographs in violation of discovery orders. The court ruled that the black and white photographs would be admitted into evidence as exhibit 94A and that the plaintiff could attempt to introduce the color photographs during Mortensen's testimony. The next day, the defendant's counsel raised a new objection, arguing that some of the notations contained on the black and white photographs should not be allowed into evidence. After further discussion, the plaintiff's counsel agreed to offer the document through Mortensen. After additional colloquy, the court vacated its order admitting exhibit 94A

into evidence.

The defendant's counsel then objected to the date being present on the photographs. Specifically, he argued that the date "coached" the witness. The plaintiff's counsel countered that the date was placed on the photographs by a paralegal from his law firm who had used the metadata from the digital version of each photograph. He further stated that he was prepared to call the paralegal as a witness to authenticate the date on the printed photographs. The defendant's counsel countered that the paralegal was not disclosed as a witness and thus she should not be permitted to testify. The court initially indicated that it would allow the paralegal to testify, but after hearing further argument from the defendant's counsel, it stated that DiNardo's testimony would proceed and the proceedings would not be "sidetracked" by the paralegal's testimony.

Several days later, the plaintiff called Mortensen as a witness, who had taken the majority of the photographs at issue. Outside the presence of the jury, the plaintiff's counsel represented that Mortensen had reviewed all of the photographs and had verified the dates listed.[12] He initialed each photograph to confirm that the handwritten date matched the electronic date. One hundred sixty-five photographs were combined as exhibit 634, along with a list of the exhibit number of each individual photograph. The defendant's counsel then stated: "But I have a real problem with these. Every one of these photographs now has . . . Mortensen's initials. I thought we resolved this early in the case, that information is not going to be put on photographs to coach a witness or to dignify it any way. I conceded on the dates, because, again, so that we didn't have to drag his tail. But now every one of the photographs he proposes to submit have handwritten initials on them." He then argued that the handwritten notation indicated a personal connection and amounted to an inappropriate validation of the photographs. After hearing from the plaintiff's counsel, the court instructed the attorneys to attempt to resolve the issue prior to the start of evidence the next day.

Two attempts to solve the evidentiary impasse failed. The defendant's counsel, however, raised a new issue with the court. Specifically, he was unable to match the electronic photographs and metadata with the printed photographs marked for identification. He also argued that there was no substantive assurance that the photographs marked for identification were the same ones provided during discovery.[13] The plaintiff's counsel then suggested that he had a data CD of the photographs sorted by date. From that source, which had some organization of the electronic versions of the photographs, prints could be made without any signatures, although it would take some time to complete. The court suspended the trial until 2 p.m. so that this task could

be completed.[14]

After the lunch break, the plaintiff's counsel reported to the court that a partial list of the printed photographs had been cross referenced to the corresponding identification number of the electronic version. Additionally, a print without any date or signature was made. Mortensen resumed his testimony. The plaintiff's counsel showed him exhibit 634. The defendant's counsel raised an objection and the court noted that exhibit 634 was what had led the court to suspend the trial earlier that day. The court then ruled: "I think the discussion before was that, essentially, that we were not going to deal with these photographs, but literally deal with the ones that you've since produced. . . . So, let me sustain the objection on the basis that these photos that have been presented to the witness based on a discussion that took place outside of the presence of the jury are those that would not form the basis of testimony by this witness, but would be, in fact, be replaced by other documents." Rather than dealing with the collection of photographs that comprised exhibit 634, the plaintiff's counsel then dealt with individual photographs.

On appeal the plaintiff contends that the court should have admitted exhibit 634 into evidence or, in the alternative, should have conditionally admitted that exhibit "subject to the later admission of further facts supporting their relevance."[15] We are not persuaded. As to the latter, we simply note that the plaintiff never requested that exhibit 634 be admitted on a conditional basis. It has not provided us with any law that required the court to do so sua sponte. With respect to the former, the plaintiff proposed the procedure that the court ultimately adopted to resolve the evidentiary dispute over exhibit 634. Rather than follow that course, the plaintiff attempted to question Mortensen regarding exhibit 634 *after the parties had agreed to have new photographs printed out without the notations on them.* "Our rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.) *Dockter* v. *Slowik*, 91 Conn. App. 448, 462, 881 A.2d 479, cert. denied, 276 Conn. 919, 888 A.2d 87 (2005).

2

The plaintiff next argues that the court abused its discretion in not admitting photographs into evidence that depicted red tape with the words "Electrical Line." The court sustained the defendant's objection to these photographs on the basis that the red tape, which had been placed there by electricians as a precaution, was too prejudicial. Specifically, the court stated: "That plastic tape, red in color, certainly would tend to flag, I think, in an ordinary person's mind that there may be some issue here, and to that extent it would be prejudi-

cial to the defendant to admit it as it is."

"[Section] 4-3 of the Connecticut Code of Evidence . . . provides: Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. In this context, unfair prejudice is that which unduly arouse[s] the jury's emotions of prejudice, hostility or sympathy . . . or tends to have some adverse effect upon [the party against whom the evidence is offered] beyond tending to prove the fact or issue that justified its admission into evidence. . . . Section 4-3 also recognizes the court's authority to exclude relevant evidence when its probative value is outweighed by factors such as confusion of the issues or misleading the jury . . . ." (Citations omitted; internal quotation marks omitted.) *Ancheff* v. *Hartford Hospital*, 260 Conn. 785, 804–805, 799 A.2d 1067 (2002).

The court did not abuse its discretion in determining that the prejudicial impact of these photographs, which depicted red tape, outweighed their probative value. See *Farrell* v. *St. Vincent's Hospital*, 203 Conn. 554, 563–65, 525 A.2d 954 (1987). The red tape also raised the peripheral issue of whether these electrical lines were powered, as noted during the colloquy between counsel and the court. In order to avoid confusing and misleading the jury, the court properly excluded these photographs. See C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 4.9, pp. 162–63.

3

The plaintiff next argues that the court improperly failed to admit miscellaneous photographs into evidence for a variety of reasons. Before discussing these additional evidentiary rulings, we iterate our scope of review. "[T]he trial court has broad discretion in ruling on the admissibility of evidence. . . . The determination of the relevancy and remoteness of evidence is within the sound discretion of the trial court. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *McNeff* v. *Vinco, Inc.*, 59 Conn. App. 698, 701, 757 A.2d 685 (2000). We also note that "[a] photograph offered to prove the appearance of . . . [something] which cannot itself be inspected by the jury must first be proved accurate. The accuracy sufficient for its admission is a preliminary question of fact to be determined by the trial judge. . . . Ordinarily . . . [a photograph] should be substantiated by testimony that it is a correct representation of the conditions it depicts, and in so far as it is properly so authenticated it becomes evidence of those conditions." (Internal quotation marks omitted.) *Madsen* v. *Gates*, 85 Conn. App. 383, 400, 857 A.2d 412, cert. denied, 272 Conn. 902, 863 A.2d 695 (2004).

After reviewing the record and briefs and considering the arguments of the parties, we conclude that the plaintiff has not shown that it is entitled to a new trial as a result of these evidentiary claims. The court's rulings with respect to exhibits 396, 397 (photographs of telephone/data closets taken eighteen months after defendant had vacated premises), 179-K, 179-L (photographs of conditions created by plaintiff) 290, 291 (photographs of cranes taken in 2008), and photographs that depicted wires pulled down from the ceiling by the plaintiff did not constitute an abuse of discretion by the trial court. Additionally, the plaintiff failed to establish that it was harmed by the court's decision to not admit exhibit 458 into evidence because exhibit 459, which was admitted into evidence, depicted the same image. We reject, therefore, the plaintiff's claims relating to photographs not admitted into evidence.

B

The plaintiff next argues that the court improperly admitted letters written by the defendant's counsel into evidence. Specifically, it contends the letters were hearsay and that it should have been permitted to examine the defendant's counsel as a witness. We disagree.

The following additional facts are necessary for our discussion. In a letter dated July 7, 2008, the defendant's counsel wrote to "Mr. DiNardo" to inform him that all of the defendant's obligations under the lease had terminated, and that any future correspondence should be sent to him. Second and third letters, dated July 17, 2008, and August 27, 2008, addressed the issue of electronic monitoring for fire and security of the property.

During the trial, the defendant attempted to introduce the first letter during Peter DiNardo's cross-examination. The plaintiff objected on the bases that the letter was not a business record and that it made the defendant's counsel a witness. After the court excused the jury, the plaintiff noted that its objections applied to all of the letters written by the defendant's counsel. It stated that the letters were made in anticipation of litigation, and therefore did not fall within the business record exception to the rule against hearsay. Further, if additional foundation was required, the defendant would be required to call his counsel as a witness, which would create an ethical dilemma. The court concluded that the letter was not made by the plaintiff in the course of its regular business and thus was not a business record. The court further determined, after considering Rule 3.7 of the Rules of Professional Conduct, that the defendant's counsel was not a "necessary witness."

1

The plaintiff first contends that the court improperly admitted the letters into evidence despite concluding that the business records exception to the hearsay doc-

trine did not apply.[16] Even if we assume that the court improperly admitted the letters into evidence, we conclude that any such impropriety was harmless.[17]

"[E]ven when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Finally, the standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely] would [have] affect[ed] the result." (Internal quotation marks omitted.) *Hayes* v. *Camel*, supra, 283 Conn. 488; see also *Daley* v. *McClintock*, 267 Conn. 399, 403, 838 A.2d 972 (2004). "A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial. . . . Thus, our analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Citation omitted; internal quotation marks omitted.) *Hayes* v. *Camel*, supra, 489.

The plaintiff's brief merely states that these letters were "highly prejudicial" and that it was denied the right to cross-examine the defendant's counsel and demonstrate that his views as expressed in the letters were inaccurate. After reviewing the totality of the evidence before the jury, we are satisfied that any error would not have affected the verdict and therefore was harmless. The plaintiff has not met its burden of demonstrating harm, particularly because many of the statements in these letters were cumulative of other properly admitted evidence. Accordingly, this argument must fail.

2

We now address the plaintiff's contention that it was not permitted to call the defendant's counsel as a witness for testimony regarding the letters at issue. Its appellate argument ignores the court's reasoning for finding that the defendant's counsel was not a "necessary witness." The court had stated: "Now here the letters that have been sought to be introduced by the defendant are ones authored by its own counsel as a representative of the [defendant]. The subject matter of the letters represent the position of [the defendant] relative to the plaintiff's claims. Now this information that's available through other [of the defendant's] representatives, and even the plaintiff himself for that matter, or itself. The information is relevant, it's material to the proceedings, and I don't believe it would work any

surprise or injustice on the plaintiff if it were to be admitted."

Rule 3.7 (a) of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless . . . (3) Disqualification of the lawyer would work substantial hardship on the client." This Rule "codifies what is commonly called the advocate-witness rule, and many cases have considered the application of this rule to determine whether a client may seek testimony from his own lawyer at trial. The rule permits an attorney actively participating in the case to be a witness as to merely formal matters but discourages testimony as to other matters on behalf of his client except when essential to the ends of justice." (Internal quotation marks omitted.) *State* v. *Thompson*, 20 Conn. App. 290, 294, 567 A.2d 837 (1989).

We are persuaded by the analysis in *Mettler* v. *Mettler*, 50 Conn. Supp. 357, 360, 928 A.2d 631 (2007), that our first step is a determination of whether the defendant's counsel was a necessary witness. "A necessary witness is not just someone with relevant information, however, but someone who has material information that no one else can provide. Whether a witness ought to testify is not alone determined by the fact that he has relevant knowledge or was involved in the transaction at issue. Disqualification may be required only when it is likely that the testimony to be given by the witness is necessary. Testimony may be relevant and even highly useful but still not strictly necessary. A finding of necessity takes into account such factors as the significance of the matters, weight of the testimony and availability of other evidence. . . . A party's mere declaration of an intention to call opposing counsel as a witness is an insufficient basis for disqualification even if that counsel could give relevant testimony. . . . *There is a dual test for necessity. First the proposed testimony must be relevant and material. Second, it must be unobtainable elsewhere.*" (Emphasis added; internal quotation marks omitted.) Id., 360; see also *Loomis* v. *Norman Printers' Supply Co.*, 81 Conn. 343, 350, 71 A. 358 (1908).

In the present case, the plaintiff baldly asserts that the letters at issue "contain statements of other persons which could not be challenged . . . ." The brief, however, does not explain the error or flaw in the court's analysis that the information therein was available through other employees or representatives of the defendant and that, therefore, the defendant's counsel was not a necessary witness. See *Mettler* v. *Mettler*, supra, 50 Conn. Supp. 363 (availability of other persons to testify about conversations and events surrounding them means that attorney not be necessary witness). Put another way, we are not persuaded that the court abused its discretion in determining that the defendant's counsel was a necessary witness pursuant to Rule 3.7

of the Rules of Professional Conduct.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The lease was described as a "triple net lease," which meant that the defendant was responsible for all expenses associated with the property, including the real estate taxes, utility expenses, insurance and maintenance. The lease, however, did place responsibility for the roofs and the structure of the buildings with the plaintiff.

[2] Practice Book § 16-37 provides in relevant part: "Whenever a motion for a directed verdict made at any time after the close of the plaintiff's case in chief is denied or for any reason is not granted, the judicial authority is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. . . ." See also *Southern New England Telephone Co.* v. *Pagano*, 79 Conn. App. 458, 465–67, 830 A.2d 359 (2003).

[3] During its charge to the jury, the court stated: "In its second count, the plaintiff alleges that the defendant violated the Connecticut Unfair Trade Practices Act, CUTPA, in that it intentionally damaged the property to thwart the re-leasing of the premises and cause the plaintiff to incur costs. . . . Following the close of evidence and pursuant to a motion heard by the court, I have determined that the plaintiff has failed to present the proof that the law requires to prevail on its CUTPA claim. Since I have made this legal determination, I am directing you that the law requires you to render a verdict in favor of the defendant on the second count of the complaint. You will do this by having the foreperson of the jury sign a defendant's verdict form . . . ." The jury complied with the court's instruction and returned a defendant's verdict on the CUTPA count.

[4] "Dictum includes those discussions that are merely passing commentary . . . those that go beyond the facts at issue . . . and those that are unnecessary to the holding in the case. . . . As we have previously recognized, however, *it is not dictum when a court of [appeal] intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy* . . . . Rather, such action constitutes an act of the court which it will thereafter recognize as a binding decision." (Emphasis in original; internal quotation marks omitted.) *Red 11, LLC* v. *Conservation Commission*, 117 Conn. App. 630, 647 n.9, 980 A.2d 917, cert. denied, 294 Conn. 918, 984 A.2d 67 (2009); see also *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, 270 Conn. 778, 808 n.26, 855 A.2d 174 (2004).

[5] The plaintiff argues that the "court erred when it chose not to be guided by the plain language of the statute" and should have employed the plain meaning rule set forth in General Statutes § 1-2z. As stated previously, the trial court properly followed the precedent from this court. We also note that we are not at liberty to revisit this court's prior decisions. "As we often have stated, this court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc." (Internal quotation marks omitted.) *First Connecticut Capital, LLC* v. *Homes of Westport, LLC*, 112 Conn. App. 750, 759, 966 A.2d 239 (2009); see also *Consiglio* v. *Transamerica Ins. Group.*, 55 Conn. App. 134, 138 n.2, 737 A.2d 969 (1999).

[6] We note that the plaintiff's preliminary request to charge contained the following statement: "The conduct at issue must occur in the defendant's primary trade or business; it must not be merely incidental to the defendant's trade or business. If you do not find that the conduct occurred in the defendant's trade or commerce, you must find that there was not CUTPA violation. General Statutes § 42-110a (4). *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, [supra] 93 Conn. App. 486 . . . ('CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce')." The plaintiff's supplemental revised request to charge, dated October 26, 2012, contained a similar statement.

[7] On October 26, 2012, the court stated: "One last item, which we—I'd relayed to counsel in chambers and they have made an inquiry. And just to be clear any exceptions to the final jury charge, verdict forms, interrogatories that are submitted to the jury, *may be raised upon the conclusion of the presentation of the court's charge to the jury*, as consistent with normal practice. So they haven't waived any rights *by not making any sort of statement today*, given the discussions we had in chambers, so you'll have those rights certainly preserved at the conclusion of the presentation of the

jury charge." (Emphasis added.) We do not interpret that statement to encompass *any challenge* to the jury charge at *any time*. The specific claim on appeal is that the court, and not the defendant, raised the "primary business theory." The plaintiff did not object to the trial court raising this issue sua sponte before that court.

[8] The plaintiff also claims that the manner in which the court informed the jury of the decision to direct the verdict on the CUTPA count was improper and prejudicial. Specifically, it argues informing the jury of the decision to direct the verdict during charge "tainted" the charge relating to the contract count. We agree with the defendant that the plaintiff failed to object to this procedure, and therefore waived this claim. See *Curtis* v. *Curtis*, 134 Conn. App. 833, 847, 41 A.3d 318 (2012).

[9] The defendant admitted the first allegation and denied the second in its answer.

[10] In fact, Luipold was employed by United Systems Integrators, which was the real estate alliance partner for United Technologies Corporation, where he was responsible for negotiating real estate on behalf of the defendant and three other business units at United Technologies Corporation.

[11] "In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . Furthermore, a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature." (Citations omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670, 791 A.2d 546 (2002); see also *Allstate Life Ins. Co.* v. *BFA Ltd. Partnership*, 287 Conn. 307, 313–14, 948 A.2d 318 (2008).

[12] The plaintiff's counsel represented that Mortensen verified the date on the printed photographs with the metadata from the electronic copy of the photographs.

[13] Further complicating matters was the fact that some of the photographs in exhibit 634 previously had been admitted into evidence. For example, exhibit 250XX was a full exhibit and contained a date on it. Within exhibit 634 was a photograph marked 250XX that contained both the date and Mortensen's handwritten initials.

[14] The court's frustration with this issue is apparent from the transcript. "All right, what I expect is when we come back at 2:00 that there's going to not be any more issues about what the photos are, which ones we're using, et cetera. That may take a herculean effort but that's what you're going to entail. I just sent [the members of the jury] off for the next three hours. Okay? I've already use two hours of their time today. That will make five hours today where they've done nothing related to this case. That frankly is—it's rude and it's I'll use the term an injustice to them. So it's going to be—the onus is going to be on counsel at this point to put things into place so that we can get moving at 2:00 efficiently."

[15] See Conn. Code Evid. § 1-3 (b).

[16] "To admit evidence under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter." (Internal quotation marks omitted.) *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 793–94, 595 A.2d 839 (1991); see also Conn. Code Evid. § 8-4.

[17] During the trial, the defendant argued that the letters were business records of Peter DiNardo, and necessary to clarify the record as to the extent of the communication between the parties after the defendant had vacated the property. The court never clarified its reasoning for admitting the letters into evidence over the plaintiff's hearsay and business records objections. In its appellate brief, the defendant posits that the letters were not offered for the truth of their contents, and therefore they were not hearsay. See, e.g., *Johnson* v. *Pike*, 136 Conn. App. 224, 236–37, 46 A.3d 191 (2012). This argument, however, does not appear to have been raised before the trial court.